# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. MICHAEL W. PARSONS

**Direct Appeal from the Circuit Court of Tipton County**
**No. 6030      Joseph H. Walker, Judge**

**No. W2010-02073-CCA-R3-CD  - Filed December 15, 2011**

A jury convicted the defendant of two counts of aggravated assault, one count of burglary of a vehicle, and two counts of theft under $500. The trial court subsequently sentenced the defendant as a Range I standard offender to three years on each of the aggravated assault convictions; one year on the burglary conviction; and eleven months, twenty-nine days on each of the misdemeanor theft convictions. The trial court ordered the sentences on the felony convictions to run consecutively, for an effective sentence of seven years. On appeal, the defendant claims five errors: (1) the trial court wrongfully deprived him of his right to counsel; (2) the trial court erred in sustaining the State's objections to the defendant's case; (3) the trial court erred in its handling of one of the jurors; (4) the jury failed to follow its instructions; and (5) the trial court erred in denying judicial diversion and in failing to apply mitigating factors when imposing sentence. We hold that the defendant is entitled to no relief and affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Richard B. Fields (on appeal), Memphis, Tennessee, for the appellant, Michael W. Parsons.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey D. Zentner, Assistant Attorney General; D. Michael Dunavent, District Attorney General; James Walter Freeland Jr. and Billy Burk, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

This case arises out of an encounter between Michael W. Parsons ("the Defendant") and Barry Laxton and Nick King after Laxton shot and killed one of the Defendant's wolf-hybrids. The proof at trial established that, on September 24, 2007, several of the Defendant's wolf-hybrids escaped the Defendant's property. Laxton was mowing the yard of the property next door. After seeing the group of loose wolf-hybrids, Laxton got a .22 rifle and fired numerous shots into the air in an attempt to scare the animals away. After the first group left the area, a single wolf-hybrid appeared. Laxton shot several more times in an attempt to scare it away. According to Laxton, the animal charged him and he shot and killed it.

The Defendant and the Defendant's wife were looking for the escaped animals when they heard the gunshots. The Defendant began walking toward the man he saw with a gun, yelling "Stop shooting my dogs!" The Defendant pulled his own sidearm and fired a warning shot into the ground, but the shooting he heard continued. According to the Defendant, the shots were fired in the direction where his wife was looking for the animals, and shots also flew past his head. According to Laxton, he fired no shots in the direction of either the Defendant or the Defendant's wife. The wolf-hybrid that Laxton shot ran to the Defendant and died at his feet.

After shooting the wolf-hybrid, Laxton joined King, who was working nearby on an adjacent property, and placed his rifle in the cab of King's pickup truck. As the two men watched the Defendant approach them, King took a pistol out of the cab of his truck and placed it in his pocket.

The Defendant accosted Laxton and King, pointed his handgun at them, and told them he was making a citizen's arrest. At this point, the Defendant was no longer on his own property. The Defendant wore an audio-recording device that recorded the encounter. The recording was played for the jury and transcribed. The encounter lasted about four minutes. At the beginning, the Defendant demands, "Where's my other dogs?" King responds, "Put the gun down." The Defendant asks, "Where's your gun at? Drop your gun." King replies, "It's a gun in –" and the Defendant states, "Drop your gun. Turn around. Turn around. On the ground. On the ground." King again says, "Put your gun down." The Defendant then says, "You're under arrest. On the ground. I'll shoot you." King says again, "Put your gun down." The Defendant says, "On the ground. You, too, on the ground now, or you will be shot. Five, four, three." Laxton says something indiscernible, and the conversation continues in the same vein with the Defendant insisting that the men are under arrest and King repeatedly telling the Defendant to put his gun down. At one point, the Defendant says,

"If you grab that gun, I'm going to shoot." The Defendant also tells the men to get away from the truck, to "[t]urn around," to "[f]ace down," and to "[l]ay down." King dials 911 and tells the dispatcher that he needs assistance because he is "being held at gunpoint." The Defendant orders King to "[t]ell them Mike Parsons has a citizen's arrest on these two." The Defendant then starts asking over and over, "Where's your gun at?" King eventually tells the Defendant, "It's in my pocket. That's where it's at, right here." The Defendant demands that King "[p]ull it out," but King refuses and keeps telling the Defendant to put his gun down. The Defendant again asserts that they are under arrest.

The Defendant begins searching the pickup, where he found Laxton's .22 rifle and a holster. When the Defendant takes Laxton's rifle out of King's pickup, Laxton says, "You leave my rifle alone," to which the Defendant responds, "Go to hell, son of a bitch. Follow me, you son of a bitch. You're going to jail." The Defendant is then recorded speaking to someone named James, apparently over the phone, and he tells James, "James, they shot and killed my dog. I stopped a guy from shooting. I fired a warning shot, and he took off running. I got his gun. And I pointed my gun at him, told him I was going to make a citizen's arrest, to put his gun down." The Defendant subsequently calls someone else and tells that person, "I went up there. . . . Told him citizen's arrest. Had him – I had the gun drawn on him, said this is a citizen's arrest. I mean business. Lay on the ground. Turn around, make sure you don't have any more guns." He also asked this person, "Where's a good place to hide this gun? I'm going to go hide this gun some place." The Defendant told this person that he had "confiscated" the gun and did not "trust the police to do ballistics on it." Law enforcement reported to the scene shortly thereafter, and the Defendant ultimately did give them the .22 rifle and handgun holster he had taken from the pickup.

The Defendant subsequently was indicted on July 7, 2008, with two counts of aggravated kidnapping, two counts of aggravated assault committed knowingly, one count of burglary of a vehicle, and two counts of theft under $500. After long and tedious pretrial proceedings, the Defendant finally was tried before a jury and represented himself, initally at his request, with the assistance of "elbow" counsel. The Defendant testified in conjunction with establishing his defenses of self-defense and citizen's arrest, asserting that Laxton had been shooting in the direction of the Defendant's wife while she was looking for the escaped wolf-hybrids, and that some of Laxton's shots flew by his head as he was also looking for the animals.

The trial court instructed the jury on self-defense and citizen's arrest. The jury nevertheless convicted the Defendant of two counts of aggravated assault as charged; one count of burglary of a vehicle; and two counts of theft under $500. The jury acquitted the Defendant of the aggravated kidnapping, kidnapping, and false imprisonment of Nick King, but was unable to reach a verdict as to the lesser-included offenses of attempt to commit (1) aggravated kidnapping, (2) kidnapping, or (3) false imprisonment of Nick King. The jury

also acquitted the Defendant of the aggravated kidnapping and kidnapping of Barry Laxton, but was unable to reach a verdict as to the lesser-included offenses of false imprisonment and the attempt to commit (1) aggravated kidnapping, (2) kidnapping, or (3) false imprisonment of Barry Laxton. The trial court declared a mistrial as to the offenses on which the jury was unable to reach a verdict.

The trial court subsequently conducted a sentencing hearing, at which the Defendant was represented by counsel. Prior to the hearing, defense counsel filed a motion for judicial diversion. At the conclusion of the hearing, the trial court denied judicial diversion. The trial court then sentenced the Defendant as a Range I standard offender to three years on each of the aggravated assault convictions; one year on the burglary of a vehicle conviction; and eleven months, twenty-nine days on each of the misdemeanor theft convictions. After finding the Defendant to be a dangerous offender, the trial court ordered the felony sentences to run consecutively to each other, for an effective sentence of seven years.[1] The trial court denied the Defendant's subsequent motion for new trial and this appeal followed.

## Analysis

Although we will address each issue raised by the Defendant, the primary issue in this case is whether the trial court committed reversible error in granting the Defendant's request that he proceed to trial pro se with elbow counsel rather than with his appointed lawyer representing him, and then refusing to grant the Defendant's subsequent request on the eve of trial that he be appointed counsel. After a number of pretrial squabbles involving different counsel appointed to represent the Defendant, the ruling allowing the Defendant to proceed pro se with elbow counsel was made, *at the Defendant's request*, approximately two weeks prior to trial. On the day before trial and on the day of trial, the Defendant reversed course and demanded representation by counsel, claiming that he had not waived his right to counsel, requesting new counsel, and requesting yet another continuance.[2] The trial court, having previously noted the multiple continuances and the fact that this case was now the oldest on the court's docket, denied the Defendant's new requests with the result that the Defendant represented himself at trial, albeit with the previously appointed elbow counsel.

## Standard of Review

Whether a criminal defendant has waived and/or forfeited his right to counsel presents a mixed question of law and fact which we review de novo, but with a presumption that the

---

[1] The trial court ordered the misdemeanor sentences to run concurrently with the first aggravated assault sentence.

[2] The trial court had already granted numerous continuances requested by the defense.

-4-

trial court's findings of fact are correct. See State v. Hester, 324 S.W.3d 1, 29-30 (Tenn. 2010); State v. Holmes, 302 S.W.3d 831, 837 (Tenn. 2010). The erroneous deprivation of counsel constitutes structural constitutional error, requiring a reversal of the defendant's convictions and remand for a new trial. See Holmes, 302 S.W.3d at 848.

*Defendant's Conduct*

A chronology of the Defendant's relationship with his lawyers is critical to evaluate this issue.

Prior to the indictment, the Defendant filed two pro se motions to continue the preliminary hearing, which were granted, and the Defendant thereafter represented himself at the hearing. The Defendant subsequently was indicted on July 7, 2008, and charged with two counts of aggravated kidnapping, two counts of aggravated assault, one count of burglary of a vehicle, and two counts of theft under $500. On July 9, 2008, the trial court filed a pretrial order setting the trial on January 20, 2009. A subsequent order recites that the Defendant "was arraigned on July 10, 2008 and requested a report back date to hire an attorney." The court ordered September 15 as the report date.

On July 29, 2008, the Defendant filed pro se a "motion to recover property in replevins" regarding a USB drive that law enforcement had seized from the Defendant in conjunction with the alleged crimes. On August 14, 2008, the Defendant filed pro se an amended motion to recover property in replevins, supported by his affidavit. This was followed the next day by the Defendant's pro se "notice of hearing" on the motion. The trial court entered an order reciting that the Defendant had appeared in court on August 19 concerning this motion and "was advised that motions would be considered after his report back date about an attorney." This order was filed August 20, 2008.

On August 21, 2008, the Defendant filed pro se a "motion to set aside court order and extend time to file pre-trial motions." This motion recites that the Defendant "is seeking legal council [sic]." The trial court extended the time 60 days.

On October 20, 2008, the Defendant filed pro se a motion to extend time to file pretrial motions, reciting that he had not yet obtained legal counsel. On the same date, he filed pro se a request for discovery and/or inspection. On December 4, 2008, the Defendant filed pro se another motion to extend the time to file pretrial motions. This motion recites that, on November 4, 2008, the court had entered an order granting a previous extension; the record does not contain a copy of this order, however. The motion also recites that the Defendant had been "communicating with legal counsel" at that time but that he "was not able to secure legal counsel." The December 4 motion requests an additional thirty days for filing pretrial motions. The record does not contain an order in response to this motion.

On January 9, 2009, the Defendant filed pro se a motion to continue trial date and extend time to file pretrial motions. This motion recites that the trial court granted a thirty day extension in response to the December 4 motion and also asserts that that order "has not been signed." The January 9 motion recites that the Defendant "has not been able to obtain legal counsel and is not prepared to file pre-trial motions nor is [he] prepared to go to trial" and requests the trial court to continue the trial date and extend the time to file pretrial motions "to a time after legal counsel has been obtained." Also on January 9, 2009, the Defendant filed an affidavit of indigency.[3] The trial court entered an order on January 9, 2009, appointing C. Michael Robbins to represent the Defendant.[4]

On January 14, 2009, Mr. Robbins filed a notice of appearance. On January 15, 2009, the trial court filed an amended pretrial order setting 45 days for the filing of pretrial motions and setting the trial for April 30, 2009. On March 31, 2009, the Defendant filed pro se a motion to discharge Mr. Robbins and continue the trial date. This motion was accompanied by the Defendant's affidavit which recites the following:

> 5. . . . Upon first contact, Mr. Robins [sic] became unstable and argumentative with me when I attempted to inform him about the facts of this case. After Mr. Robins['] explosive behavior and his statement that he could not represent me, I returned to the Circuit Court and informed the bailiff that Mr. Robins said he could not represent me. The Bailiff went to the judge and then returned to say the judge would appoint another attorney and to contact the clerk's office on Tuesday to find out who it would be.
>
> 6. On Tuesday, January 13, 2009 I contacted the clerk's office and was told the Judge had not informed them of a different appointment.
>
> 7. Later that morning, Mr. Robins contacted me with a different attitude and said he had talked to the public defender's office and now knew what the case was about and he could represent me.
>
> 8. I then scheduled with Mr. Robins to meet him on January 19, 2009 at his office in Covington Tennessee.
>
> 9. I then met Mr. Robins at that time and spent two hours answering his questions. But again, Mr. Robins refused to allow me to inform him of the

---

[3] In his affidavit of indigency, the Defendant claims to have attempted unsuccessfully to hire ten different lawyers.

[4] A later order entered by the trial court recites that the Public Defender's office had reported a conflict of interest in representing the Defendant.

events of September 24, 2007 and July 2008. Mr. Robins then said he would get some information for me and scheduled to meet again two days later on January 21, 2009. Mr. Robins also said the reason he was appointed to represent me was because there was a conflict of interest with the public defender's office because they might have overheard evidence that would be relevant in my case.

. . .

11. [During a conversation on February 3, 2009], Mr. Robins again became argumentative with me. I then asked Mr. Robins if he was working for me or the court. Mr. Robins refused to answer the question and then threaten[ed] me that he would tell the court that I was not being cooperative.

12. When I met Mr. Robins he informed me now that in his opinion there was not any evidence that the public defender's office had or was willing to acknowledge that would support a reason for their having a conflict of interest regarding overhearing comments by the prosecutor that was the original reason he was appointed to represent me. Mr. Robins also confirmed he was in the process of selling his house. Mr. Robins informed me he would not keep information I gave him in confidence and that he was required to give notice to the prosecution of anything he learned regardless if that information was going to be presented in court.

13. I informed Mr. Robins that he apparently had conflicts [and] that I did not trust him. I suggested I would move the court to remove Mr. Robins or he could remove himself.

. . .

16. . . . [O]n March 26, 2009, . . . I asked [Mr. Robbins] had [h]e filed any motion[s] in my case and after several request[s] he finally said he had not. Therefore, I informed him since he had not; I was going to file a motion to remove him as counsel.

17. Several years ago I performed a home inspection for Mr. Robins on an old house he bought that had many problems. This also creates a conflict of interest.

In the motion which this affidavit accompanied, the Defendant alleged that

> Mr. Robins [sic] does not want cooperation; he wants to dominate and refuses to exercise every defensive measure and motions available to protect [the Defendant's] rights. Mr. Robins has attempted to coerce [the Defendant] to lie to the court and to plead guilty to crimes [the Defendant] is not guilty of. Ultimately Mr. Robins cannot represent [the Defendant] when he refuses to listen to [the Defendant]. Mr. Robins['] concern that his demeanor before the court is more important than proper representation of [the Defendant], indicate[s] a conflict of interest.

The motion requests the trial court "to Remove Michael Robins as Legal Counsel . . . and appoint competent legal counsel free of conflicts . . . as required by law. [The Defendant] also Moves this court to continue this case to a date in the future after proper legal counsel has been obtained."

On April 7, 2009, the trial court entered an order, reciting that a hearing had been held on the Defendant's motion; however, a transcript of the hearing is not included in the record on appeal before this Court.[5] The order recites that

> Mr. Robbins made statement with regard to difficulties in the representation. The Court requested they confer and attempt to resolve the differences. Later that day in open court they reported back that they could not resolve the differences.
>
> [The Defendant] announced that he had reported Mr. Robbins to the disciplinary counsel. The Court relieves Mr. Robbins from representation.

The trial court requested the Public Defender to determine if its office still had a conflict. On April 13, 2009, the trial court entered an order allowing the Public Defender to withdraw "as stated in open court on April 9"[6] and appointing Rebecca Mills to represent the Defendant.

On April 23, 2009, the Defendant filed pro se motions, including a request that the trial court set aside its previous order allowing the Public Defender to withdraw and that the case be continued. The motion also contains the following allegations concerning the

---

[5] We note that, when a defendant fails to submit a complete record on appeal, the State may seek to supplement the record. See Tenn. R. App. P. 24(a), (b).

[6] The record does not contain a transcript of any proceedings conducted on April 9. See footnote 5, supra.

Defendant's consultation with new counsel that "revealed several things [that] bring her ability to provide proper legal counsel into question":

1. That in her 15 years as an attorney Ms. Mills has had very few criminal cases and only a hand full of these criminal cases were taken to trial. And that she has no trial experience involving the charge of aggravated kidnapping.

2. Ms. Mills revealed she did not know the statutes for self defense and did not know a person could enact a citizen's arrest.

3. Ms. Mills also discussed her work load and limitation of time.

4. She informed me that "I have a real problem with someone always saying they want to sue someone or says if you don't do me right I'm going to report you" eluding [sic] to my complaint filed with the Board of Professional Responsibility about the behavior of Mr. Robbins while he was appointed to me as legal counsel.

5. She stated she was not going to put her health at risk citing a previous criminal case she had handled. Indicating she did not want a stressful case.

6. Ms. Mills states that she preferred to do Social Security cases.

The Defendant also set forth reasons supporting the appointment of Mr. Gary Antrican, the District Public Defender, to represent him:

e) That on April 09, 2009 [the Defendant] met with the District Public Defender Mr. Gary Antrican after leaving the court, and was informed that Mr. Antrican had an ex parte meeting with this court. Mr. Antrican also informed [the Defendant] of the context of that meeting and the basis of his concern with regards to acting as [the Defendant's] legal counsel. And that Mr. Antrican informe[d] [the Defendant] that he would be willing to act as legal counsel for [the Defendant] if the court ordered him to in spite of his concern regarding a perceived conflict of interest with one of his employees. He would just not let that employee work on my case. . . . Therefore, for all these reasons stated and the law, [the Defendant] moved [sic] this honorable court to set aside its order filed on April 13, 2009 and reappoint Mr. Antrican as legal counsel in his mat[t]er.

On April 24, 2009, the trial court ordered that pretrial motions be filed within 25 days and continued the trial to August 4, 2009. The court also ordered the following:

The defendant was indicted in July 2008. He made multiple appearances while attempting to secure counsel. He reported with regard to meeting with various attorneys and was not able to secure counsel.

Upon request by the defendant for appointed counsel, the Court appointed the Public Defender who immediately reported a conflict due to the possibility of one member of the staff possibly being a witness to one aspect of the case. The Court appointed Attorney Mike Robbins, who accepted representation and began preparing for trial.

The pre-trial order was amended and the trial was re-set for April 30.

On March 31, the defendant filed an affidavit to remove Mr. Robbins as counsel and to continue trial date. After a hearing on April 7, the Court allowed Mr. Robbins to withdraw. . . . Mr. Robbins was under the impression that there was nothing of substance to the alleged matter where the public defender would be placed in a conflict, and the Court asked the public defender to meet with the defendant to determine whether his office still had a conflict. The public defender reported a conflict existed.

The Court appointed Attorney Rebecca Mills to represent the defendant on April 13.

On April 23, the defendant filed a Motion to have a different attorney and for Ms. Mills to withdraw, alleging that he met with Ms. Mills, and the defendant did not feel she had adequate experience to represent him.

On April 24, 2009, the Court had a hearing, after which the request for a different attorney by the defendant was denied.

The record before this Court does not contain a transcript of the April 24 hearing.[7]

On April 28, 2009, Ms. Mills filed a motion to have a psychiatric evaluation of the Defendant performed. This motion was accompanied by an affidavit of Michael Robbins setting forth the following:

7. Throughout the entirety of the time [of his representation of the Defendant], the defendant remained unwilling to cooperate in any meaningful manner with me in the preparation and defense of this case. At all times when I attempted

---

[7] See footnote 5, supra.

-10-

to advise and inform him of relevant legal matters concerning the case, he constantly would interrupt, *refusing to listen and to respond appropriately*. Instead, the defendant has continually engaged in constant argument about his understanding of legal matters with me.

8. On or about 2.27.09, I spoke with the defendant by phone and . . . [t]he defendant was not responsive, but insisted that I was "working for the State" and was not interested in his defense. Further, any discussion by me of consideration of the possibility of an agreed settlement of the case has always met with the defendant's response that I wanted him to mislead or deceive the court.

. . .

11. On or about 3.26.09, I received a phone call from the defendant in which he was angry and insulting. He accused me of deceiving him, of not representing him, and of working for the State in this prosecution. *He refused to cooperate so that I might visit his property where the relevant events allegedly occurred*. He repeatedly would ask me why I needed to do that, but would not listen when I explained to him the importance of familiarity with the scene in terms of trial preparation.

. . .

13. Throughout the time of my active representation of the defendant, *I have not been able effectively advise and inform him about the case because he will not listen; he constantly interrupts; he argues; and he accuses me of various forms of misconduct, both criminal and that which is in his view a violation of disciplinary rules applicable to attorneys*.

14. In particular, the defendant, throughout my entire time of representing him in this matter, *has consistently maintained that he is entitled to complete control of every action I take as his attorney to the point that, in his words, he is "driving the train."* I have made numerous efforts to advise and inform the defendant of the bounds of the area of legal representation in a criminal case which is within the client's control; and, further, about the area of the representation which is in the attorney's control, subject of course to appropriate consultation with and advi[c]e to the client.

15. Through the entire time which is addressed in this affidavit, the defendant has never indicated understanding in the least degree of the role of his attorney

in defending him in a criminal case. By insisting that he, the defendant, has the entire control of everything connected with his defense, and refusing to listen to attorney advice, *the defendant rendered undersigned counsel unable effectively to represent him in this matter.* Specifically, by way of example, *the defendant has constantly maintained his orders to me to file specific motions which I do not find supported by law or fact; and to offer specific evidence at his trial which I do not find in my professional judgment to be in his best interest; and which, further, in my judgment would not be admissible at the trial based on the Tennessee Rules of Evidence.*

16. In summary, I have advised the defendant that he is not entitled under law to be represented simultaneously by appointed (or retained) counsel and by himself, pro se. I have made all reasonable efforts to confer with and to advise the defendant in all necessary particulars pertaining to this case. In the end, *the defendant has been singularly uncooperative* because of his belief, which I consider is held honestly, that he has just such a right.

(Emphases added). Two days later, on April 30, 2009, Ms. Mills filed a number of pretrial motions on the Defendant's behalf.

On May 13, 2009, the Defendant filed pro se motions seeking to strike the motion for a psychiatric evaluation, to remove Ms. Mills as counsel, and for a continuance. These pleadings assert, in part, that Mr. Robbins' affidavit "is an apparent retaliation brought on by my complaint filed against him for unprofessional behavior with the Board of Professional Responsibility"; that the motion for an evaluation is "scandalous" and "a baseless attempt to prejudice" his case; that Ms. Mills "has violated several rules of professional conduct"; and that Ms. Mills' actions "have forced [the Defendant] to subsequently file a complaint . . . with the Board of Professional Responsibility." The motions were accompanied by an affidavit in which the Defendant asserts, among other things, that "On April 24, 2009, Rebecca Mills attacked me outside of the Circuit Court and subsequently I filed a complaint with the Covington City Police Department."

On May 13, 2009, the trial court ordered the employment of psychologist Dr. Wyatt Nichols for a mental evaluation of the Defendant and ordered the Defendant to report for the evaluation on May 27, 2009. The Defendant filed pro se an emergency motion with this Court seeking a stay of the trial court's order, which this Court denied. The Defendant did not appear for his ordered evaluation. On May 28, 2009, the trial court ordered the Defendant to appear and show cause regarding his failure to meet with Dr. Nichols. The Defendant filed pro se a motion to continue the show cause hearing, which the trial court did not grant. Upon the Defendant's failure to appear at the show cause hearing, the trial court ordered a conditional forfeiture of the Defendant's bond and further issued an instanter

-12-

capias for the Defendant's arrest. The trial court subsequently ordered the Sheriff's Department of Tipton County to transport the Defendant to Dr. Nichols' office on June 9, 2009.

On June 11, 2009, a copy of a letter from the Defendant to Ms. Mills was filed with the court. The text of the letter is as follows:

> On Monday June 1, 2009, I was served a notice about a court date on June 5. I called your office, but my calls were not returned.
>
> Since you have proven yourself to be an ineffective counsel, consider this formal notification that you are fired.
>
> Please forward all information that you have on my case to the following address:

A Post Office Box address was provided. On June 12, 2009, the Defendant filed pro se a motion to set aside the trial court's order regarding his failure to appear and to restore his bond. The Defendant claimed that he was in Circuit Court in Shelby County on the day set for the show cause hearing and that he had been unable to locate Dr. Nichols' office.

On June 15, 2009, Ms. Mills filed a motion to set bond, which asserts that the Defendant was transported to his appointment with Dr. Nichols and that the Defendant "was cooperative at the evaluation." On the same day, the trial court set the Defendant's bond at $50,000, which the Defendant subsequently made. Ms. Mills filed a motion to reinstate the original $25,000 bond, which the trial court granted.

On July 6, 2009, the trial court granted a further forensic evaluation on Dr. Nichols' recommendation. Dr. Nichols' report on his initial evaluation of the Defendant was filed. That report includes the following assessment:

> Even though [the Defendant] attempted to be cooperative during this evaluation, I was unable to complete the initial portion of this assessment, which focused on his competency to stand trial. He was so preoccupied with his innocence and a conspiracy against him for appealing his failed 2006 political campaign for County Executive of Tipton County, that I was unable to sufficiently redirect him to answering my questions. When I could get him to answer a question, Mr. Parsons might give a short answer before he resumed his adamant pronouncement of his innocence and how his charges and inability to get a fair hearing are the result of a conspiracy against him by the present Tipton County Executive, Judge Peeler, Judge Walker, the Tipton County

-13-

Sheriff, and the District Attorney. Mr. Parsons also informed me that he has filed a report with the police alleging that his attorney has assaulted him.

. . .

Even though I could not obtain specific answers to the required questions asked in a competency to stand trial evaluation, it is obvious that Mr. Parsons is an intelligent individual who has sufficient knowledge of the criminal justice system to proceed to court.

Dr. Nichols' report recommended that the Defendant be hospitalized "for possible treatment and the continuation of this evaluation on a psychiatric unit that conducts court-ordered forensic evaluations. The 24-hour observation and comprehensive evaluation offered by an inpatient forensic unit will be helpful in determining how much control Mr. Parsons' actually has over his thought processes."

After the Defendant received Dr. Nichols' report, he hired Dr. John V. Ciocca, clinical psychologist, for an independent evaluation. Dr. Ciocca's report was filed with the trial court and provides, in pertinent part, as follows:

Over the course of the two hour interview I found Mr. Parsons to be very eager to discuss the full scope of his case in all of its particulars. He summarized the legal proceedings in a clear and understandable fashion and was readily redirected to discussion of issues relevant to a competency evaluation. His discussion of the events of September 24, 2007 was clear and distinct. He demonstrated the ability to review the events of that day from his perspective in a manner that was helpful and rational. He discussed his conflicts with past and present legal counsel and indicated that he felt present counsel was inexperienced.

Mr. Parsons was able to summarize the nature of the offenses with which he is charged and understood the scope of the possible consequences. He was able to discuss the possible length of incarceration if found guilty of the offenses. His understanding of the role of the prosecutor, defense attorney, judge and jury was well elaborated.

He discussed the anxiety he experienced when he was evaluated by Dr. Nichols and indicated that the evaluation was brief and incomplete. He noted that he was in the custody of the State of Tennessee at the time of the evaluation, having recently been detained. Clearly he was able to participate

with this examiner in a cooperative and forthcoming manner in a more relaxed and voluntary setting.

Mr. Mike Parsons demonstrates the capacity to understand the nature and the object of the proceedings against him, to consult with counsel and to assist in preparing his defense. He has summarized his difficulties with his current and previous attorney. Clearly, Mr. Parson's [sic] has demonstrated his ability to be demanding and challenging at times. However, he has demonstrated the capacity to consult with counsel in the preparation of his defense, despite his disagreements with current counsel.

Overall, he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. Further, he has a rational as well as factual understanding of the proceedings against him.

There is no indication that he suffers from a mental illness or psychological deficit that would render him incompetent to stand trial.

Faced with these contradictory reports, on July 9, 2009, the trial court ordered a third psychological evaluation to be performed. Ms. Mills filed a motion to continue the trial, which the trial court granted. The trial court ordered the trial set for November 19, 2009, and ordered mental evaluations to be completed by August 25, 2009.[8]

At some point not reflected in the record, the Defendant filed pro se with this Court an application for permission to appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure to, in part, "[o]rder the lower court to remove its' appointed counsel Rebecca Mills and appoint the public defender Mr. Gary Antrican for good cause shown." This Court denied the application. A copy of the Order was filed with the trial court on July 24, 2009.

On subsequent motions by Ms. Mills, the trial court permitted the employment of an investigator and the further services of Dr. Ciocca as (1) a consultant, (2) to testify on the Defendant's behalf, and (3) to assist in preparing the Defendant for trial.

On October 9, 2009, Ms. Mills filed a motion to withdraw which asserts the following:

2. That on multiple occasions the Defendant has referred to counsel as "elbow counsel" and stated he wishes to represent himself.

---

[8] The record contains no further reports of mental evaluations.

-15-

3.  That the private investigator, hired in this matter, was told by the Defendant when the private investigator told the Defendant he had to run something by the undersigned counsel before acting in accordance with Defendant's request, Defendant asked the private investigator who he was working for, the Defendant, or the undersigned counsel.

4.  That *the Defendant* asks to review motions before filing the same, but *does not respond in a timely manner*, causing a delay in the filing of said motions.

5.  That *the Defendant does not cooperate with the undersigned counsel* and questions counsel as to all counsel's advice, suggestions, or otherwise, hampering Defendant's representation.

6.  That the Defendant records sessions with counsel and other meetings making it difficult for counsel to have candid, confidential, meetings and discussions about the facts of his case.

7.  That the Defendant continues to pursue irrelevant matters instead of focusing on issues that will come before this Court in this trial.

8.  That the Defendant continues to confuse his role in the legal process, and as a result, confuses the roles of counsel and others employed to assist him in this matter and that the *[Defendant's] actions affect counsel's ability to effectively prepare a defense and prepare for trial*.

(Emphases added)  Ms. Mills filed numerous other motions on behalf of the Defendant on October 9, 2009, including a motion for recusal of the trial judge.  The trial court set the motions to be heard on November 2, 2009, at the Defendant's request.

On November 2, 2009, Ms. Mills filed a motion for change of venue on behalf of the Defendant.  This motion alleges, among other things, that the Defendant "has filed a federal suit against the Attorney General, Michael Dunavant."  The motion is accompanied by an affidavit by the Defendant in which he sets forth numerous allegations of false charges and vindictive and politically-motivated prosecution.

On November 2, 2009, the trial court held an evidentiary hearing on these motions.  At the hearing, the Defendant testified as follows:

-16-

I have a right to be represented by legal counsel, or to represent myself, or in the third, in the alternative, which I acknowledge to the Court is my choice, is to have elbow counsel . . . .[9]

. . .

[T]he law dictates that I have control [over this case].

. . .

What I've said is, from the very beginning, that as the law dictates that the client should make ultimately all the choices in the case and not be led. Of course, if they're not sure, then take advice from their counsel. And that's what I'm looking for, is legal counsel, not someone to lead me down a path which I believe is the path of destruction.

. . .

The things that I have control over according to the law, I want to take full advantage of those choices. And according to the Code of Ethics, everything related to my case that's presented that is authorized by the Court, I have the ability to present. And that's why I'm trying to preserve that right in the court here today . . . .

. . .

I'm looking for elbow counsel . . . .

. . .

And I would ask for a continuance . . . .

---

[9] The Defendant was incorrect in his assertion that he had the "right" to "elbow counsel." Our Supreme Court has interpreted the term "elbow counsel" to mean "an attorney who functions in a purely advisory role, without actively participating in the trial. A pro se defendant who is permitted such counsel may consult counsel for guidance and advice, but otherwise handles the defense of the case on his or her own." State v. Small, 988 S.W.2d 671, 672 n.1 (Tenn. 1999). The appointment of advisory counsel to assist a defendant who wishes to proceed pro se is discretionary with the trial judge. Id. at 672; see also, e.g., United States v. Green, 388 F.3d 918, 922-23 (6th Cir. 2004) (recognizing that defendant had no protected right to represent himself and have appointed to him a lawyer to act as his co-counsel). We will not overturn a trial court's decision regarding the appointment of advisory counsel absent an abuse of discretion. State v. Carruthers, 35 S.W.3d 516, 551 (Tenn. 2000) (citing Small, 988 S.W.2d at 675).

-17-

The Defendant also testified during cross-examination by the State that he is a "sovereign citizen."

The trial court also questioned the Defendant:

THE COURT: Mr. Parsons, you had indicated that you've been studying the matter. Are you talking about studying the law? You said you've done a lot of reading. Are you talking about legal issues?

DEFENDANT PARSONS: I've been reviewing the case law that I've found and the case law that I've been provided by Ms. Mills regarding representing yourself and regarding citizen's arrest. I have studied that extensively, and the self-defense laws, the law that states that you're not required to retreat when someone is attacking you, that you have a[n] ultimate, God-given right to defend yourself. Since Cain and Able [sic] there's been a right to defend your life and your property.

THE COURT: Have you ever represented yourself in any other criminal prosecution?

DEFENDANT PARSONS: I represented my – I was the person that handled the case in the probable cause hearing in this matter, Your Honor.

THE COURT: And you're asking that Ms. Mills or some attorney serve only as elbow counsel; is that correct?

DEFENDANT PARSONS: To the degree that I have the right to have legal counsel as afforded by the Constitution, and to the degree that the case law that shows that not only am I entitled to elbow counsel, but I can allow them to participate in the presentation, not just to sit there quietly and nudge me when I'm supposed to make an objection, but they also have the ability to cross-examine me if I'm on the stand. It's very difficult for one to cross-examine themselves, and to do the mechanics of that, it takes that assistance.

And also when doing the voir dire, sometimes you have a benefit. As the prosecution I have observed in this very courtroom, they'll use two different people. One does the voir dire, one does certain presentation to witnesses, because they have strengths in those given areas. And I think I should be entitled the same opportunity and rights afforded under, well, case law and everything that the law stands for.

-18-

For due process is that you have a fair shot at this, and it's not just a way to eliminate [sic] your ability to present the truth. That's what I'm here for, is to present the truth to the best of my ability.

THE COURT: You understand you're charged with aggravated kidnapping, two counts; aggravated assault, two counts; burglary of a vehicle; and theft under $500; that ranges from very serious felony offenses down to a misdemeanor; that if convicted, as you testified earlier, you face substantial time perhaps in incarceration?

THE DEFENDANT: Yes, sir. I take the charges very seriously, and that's why I've done this amount of evaluation. And because the times when I've come before Your Honor after the appointment of Ms. Mills and I've tried to approach the Court and been told to speak through the attorney, and then the information that the Motions contained do not totally reflect the facts of this case.

And I understand that sometimes there's typos, sometimes there's changes of phrases. Those things mean things, and depending on the way it's viewed by the judge or the jury, it could have an impact on their view and their perspective. And I don't want the jury or the judge to be slanted or skewed to a false assumption. I would like for the truth of the facts to come out in this matter so that ultimately I perceive this sham case can be dismissed, and the person who assaulted and attacked me and my wife and killed our family pet can be dealt with.

THE COURT: Okay. The Court is going to allow her, then, to act as elbow counsel for you, to assist you in the presentation of the case. As you indicated, she can do the voir dire if that's your choice, or the way that you and she want to work the matter out. The Court is going to grant her Motion [to withdraw] in part.

As to the Defendant's motion for a continuance, the trial court stated,

*this case is one of the oldest on the Docket.* I feel like the matter has been postponed needlessly in the past. And it's been set now for months on this date. *It was set multiple times*, the last time being in August, and reset now for months, [s]o the court feels like it needs to go forward on the scheduled date unless there is some good, legitimate reason.

(Emphases added).

At the conclusion of the hearing, the Defendant argued,

> Just to reiterate for the record, Ms. Mills notified me just days ago about her asking to be removed, and I gave testimony today citing the fact that we have conflicts in perspective and viewpoints and tactics, a number of things that are critical to the outcome of this case.
>
> And I think I'm entitled to have, according to the law and according to the Constitution and according to the Rules and according to the statutes and case law, I'm entitled to have legal representation that is effective.
>
> [A]nd what I've got is an attorney who has from time to time worked against me. Perhaps in her thinking it's the best thing. But in my understanding, in my belief, it's been totally wrong and working against me.
>
> . . .
>
> And I would ask the Court to reconsider recusing Rebecca Mills and recusing Your Honor and request a continuance of at least two months for time to find other legal counsel or prepare to represent of my own accord.

The trial court denied the request for a continuance and stated its recognition that the Defendant "is a well-educated person, has been through the court system a number of times on his own in civil matters, to include appeals to the appellate courts and so forth. So I feel like he's much better equipped to assist himself and to handle a case than most defendants." The Defendant subsequently stated a third time that he chose to proceed with elbow counsel, but also asserted that he wanted different elbow counsel. The trial court denied the Defendant's request for new counsel. The trial court also denied the Defendant's motions to dismiss the indictment, for change of venue, and for recusal of the trial judge.

The trial court also filed a written order with regard to the motions and the November 2, 2009 hearing.

On November 12, 2009, the Defendant filed pro se a motion to continue. This motion contains complaints about Ms. Mills and asserts that the trial court "appointed her as elbow counsel for Mr. Parsons despite the fact no one asked for this and against Parsons['] Objections." The trial court denied the motion and denied the Defendant's request for different counsel by order filed November 16, 2009. The trial court's order recites that, after Ms. Mills was appointed,

Defendant continued to represent himself and would not cooperate with counsel. Counsel moved to withdraw. Defendant moved to continue pro se, but have elbow counsel. The Court allowed Ms. Mills to withdraw and to assist defendant as elbow counsel. Defendant now says that he wants different elbow counsel, or an opportunity to employ competent counsel in his behalf. The request for different elbow counsel is denied. The request for additional time to employ counsel is denied.

On November 18, 2009, the Defendant filed pro se with this Court an "Emergency Application for an Extraordinary Appeal and Stay of the Lower Courts Order" regarding the trial court's denial of his motion for a continuance. This pleading also contains a request that the trial court be ordered to "provide Proper Legal Counsel." This Court denied the application by order filed on November 18, 2009.

On November 19, 2009, the day on which the Defendant's jury trial began, the Defendant filed pro se a pleading titled "Notice of Termination of Counsel Rebecca Mills for Ineffective Assistance of Counsel." This pleading includes a "request this honorable court to appoint him another attorney from the office of the public defenders office to take on this case and grant him or her a reasonable amount of time to diligently research applicable case law and statutory defenses so that he can prepare, write and file some competent pre-trial motions instead of doing nothing like the current lazy and worthless . . . Rebecca Mills that I have just fired." This pleading also contains the statements, among others, "I DO NOT WAIVE MY RIGHT TO COUNSEL"; "I DO NOT WANT TO REPRESENT MY SELF"; and "I OBJECT TO THE JUDGE OF THIS COURT FORCING COUNSEL ON ME THAT IS NOT THE SIXTH AMENDMENT COUNSEL OF MY CHOICE IN VIOLATION OF THE FOLLOWING FEDERAL AND STATE CASES." The pleading concludes,

> if this court denies my motion that I be appointed another attorney from the public defender's office, I request that this court order the current attorney Rebecca Mills office to start doing her job, otherwise, if she keeps doing 'nothing' for my defense in this case, I fully intend to file [a]n additional complaint with the Tennessee State Bar Association and quite possibly a civil lawsuit against her for "**ineffective assistance of counsel**," and a claim on her **"bond."**

The record before this Court does not contain a written order disposing of these motions.

Also on November 19, 2009, the Defendant filed with the trial court (1) a copy of a lawsuit filed on November 18, 2009, in the United States District Court of the Western District of Tennessee by him as plaintiff against the trial judge, Rebecca Mills, and Michael

Robbins, among others, alleging a conspiracy to violate his civil rights; and (2) a copy of a complaint in the Circuit Court of Tipton County by the Defendant against Nick King, one of the victims in this case.

The Defendant's jury trial began on November 19, 2009. When the trial court asked if the Defendant was ready to proceed, he replied, "No, Your Honor, we're not. Your Honor, I object to this Court taking me to trial today without counsel." The trial court excused the venire and allowed the Defendant to proceed. The Defendant continued:

> Let the record reflect that I do not waive my right to counsel. . . . Your Honor, I do not wish to defend myself, and let the record so reflect. . . . *I do reserve the right to represent myself, but I also demand my right to be represented by counsel . . . . I object to any attempts of this Court to appoint counsel to me, not of my choice, in violation of the Sixth Amendment.*
>
> . . .
>
> Your Honor appointed Rebecca Mills. Rebecca Mills asked to withdraw just two weeks before the trial. This was a setup. And then Your Honor allowed her to be off the case because she and I couldn't work together because she didn't agree to allow me to put forth my proof that exonerates me. But then Your Honor put her back on my case. That's a travesty of justice. That's manipulation of the courts.

When the trial court responded that it appointed Ms. Mills to continue "[j]ust as elbow counsel, to give you advice like you requested," the Defendant stated,

> No, I did not request her, I asked that – she asked to be off the case. And there's no way that Your Honor can appoint her as counsel in any capacity. Once she asked to be withdrawn and you withdraw her, she can no longer be a party to this case.
>
> Also she has been served with Notice today that she is being sued, as well as Your Honor, in Federal Court. And in light of that, your Court has a pecuniary interest. Rebecca Mills has a pecuniary interest. Justice cannot be served by you overhearing this trial today, nor Rebecca Mills acting in some kind of fabricated capacity of legal counsel, which she has never been from day one working in my best interest.
>
> I would ask the Court to postpone this hearing at this point and set aside a date in the future to where I will have time to either prepare for this – you

gave this attorney seven months. I've been given two weeks. That's denial of due process, Your Honor, I'm entitled to a fair trial.

. . .

> *From day one I said that I represent myself and I asked to be provided proper legal counsel as provided for within the law.*

(Emphases added). Additionally, Ms. Mills asked to withdraw as elbow counsel because of the conflict created by the lawsuit the Defendant had filed against her. When the trial court asked the Defendant if he was waiving his right to counsel, the Defendant replied, "I do not waive my right to have counsel. I want counsel, what I've said since day one. Throughout the entire event I've asked for proper legal counsel." The trial court told the Defendant that he had the choice of continuing with Ms. Mills as elbow counsel or representing himself. The Defendant continued to object and to seek a continuance and the appointment of different counsel. Ms. Mills renewed her motion to withdraw as elbow counsel. The trial court acknowledged that Ms. Mills was "in a very bad position" but asked her "to please remain in the courtroom, and if [the Defendant] needs any help with regard to procedural matters, to assist him to the best of your ability, even though he alleges and you allege that you've been sued by him." Ms. Mills acquiesced to the judge's request. A jury was then selected and the trial proceeded. The Defendant conducted voir dire, examined witnesses, raised objections, testified on his own behalf, and made his own arguments. The Defendant also submitted requests for special jury instructions.

### Loss of Right to Counsel

The Defendant contends that he was wrongfully deprived of his constitutional right to counsel at trial. We disagree.

Criminal defendants are guaranteed the right to counsel at trial by both our federal and state constitutions. U.S. Const. Amend. VI; Tenn. Const. art. I, § 9; see Gideon v. Wainwright, 372 U.S. 335, 342-44 (1963); Poindexter v. State, 191 S.W.2d 445, 445 (Tenn. 1946). This right is deemed so important that its wrongful deprivation results in a structural error requiring reversal. See Chapman v. California, 386 U.S. 18, 23 n.8 (1967); Holmes, 302 S.W.3d at 838. The right to counsel is not without its limits, however. Holmes, 302 S.W.3d at 838. "The right to counsel is limited by the interest in proceeding with prosecutions on an orderly and expeditious basis." United States v. McQueen, 445 F.3d 757, 760 (4th Cir. 2006). And, the right to counsel "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." United States v. Krzyske, 836 F.2d 1013, 1017 (6th Cir. 1988).

-23-

Moreover, the right to counsel "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000). See also Caplin & Drysdale v. United States, 491 U.S. 617, 624 (1989) (recognizing that the Sixth Amendment right to counsel does not guarantee that an indigent criminal defendant will be represented by the lawyer of his or her choice). As pointed out by the United States Court of Appeals for the Sixth Circuit, "[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." United States v. Iles, 906 F.2d 1122, 1130 (6th Cir. 1990). Rather, "[t]he essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant." Carruthers, 35 S.W.3d at 546 (citing Wheat v. United States, 486 U.S. 153, 159 (1988)). We emphasize that "the right to counsel is a shield, not a sword. A defendant has no right to manipulate his right for the purpose of delaying and disrupting the trial." United States v. White, 529 F.2d 1390, 1393 (8th Cir. 1976). See also, e.g., State v. Montgomery, 530 S.E.2d 66, 69 (N.C. Ct. App. 2000) ("'[A]n accused may lose his constitutional right to be represented by counsel . . . when he perverts that right to a weapon for the purpose of obstructing and delaying his trial.'") (quoting State v. McFadden, 234 S.E.2d 742, 747 (N.C. 1977)).

Concomitant with the right to counsel is the constitutional right to represent oneself. See Faretta v. California, 422 U.S. 806, 832 (1975); Hester, 324 S.W.3d at 30. These rights are alternative, however, and a defendant cannot simultaneously represent him or herself and be represented by counsel. Hester, 324 S.W.3d at 30; State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976).

In order to exercise his right to represent himself, a criminal defendant must waive his right to counsel. Hester, 324 S.W.3d at 30; see also Tenn. R. Crim. P. 44. "Ordinarily, waiver of the right to counsel must be voluntary, knowing, and intelligent," and typically occurs "only after the trial judge advises a defendant of the dangers and disadvantages of self-representation and determines that the defendant 'knows what he is doing and his choice is made with eyes open.'" Carruthers, 35 S.W.3d at 546 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942)). Significantly, however,

> the right to counsel is not a license to abuse the dignity of the court or to frustrate orderly proceedings. Accordingly, . . . like other constitutional rights, the right to counsel can be implicitly waived or forfeited if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial.

Id. at 546-47 (footnotes omitted). See also Holmes, 302 S.W.3d at 838 (recognizing that a criminal defendant may be found to have forfeited his right to counsel when he "engages in an 'egregious manipulation' of the right to counsel 'so as to delay, disrupt, or prevent the

-24-

orderly administration of justice') (quoting <u>Carruthers</u>, 35 S.W.3d at 550); <u>State v. Cummings</u>, 546 N.W.2d 406, 418 (Wis. 1996) (recognizing that "unusual circumstances, most often involving a manipulative or disruptive defendant, permit a court to find that the defendant's voluntary and deliberate choice to proceed pro se has occurred by operation of law") (internal quotation marks omitted).

Our Supreme Court has described the difference between an implicit waiver of the right to counsel and a forfeiture of the right to counsel in <u>Holmes</u> and <u>Carruthers</u>. An implicit waiver occurs after the defendant engages in misconduct that he or she has been specifically warned will result in the loss of counsel. <u>See</u> <u>Holmes</u>, 302 S.W.3d at 840-41; <u>Carruthers</u>, 35 S.W.3d at 549. A forfeiture, in contrast, results in the defendant losing his right to counsel even though he has not been previously warned about this result of his misconduct. <u>See</u> <u>Carruthers</u>, 35 S.W.3d at 548-50; <u>United States v. Goldberg</u>, 67 F.3d 1092, 1100-02 (3d Cir. 1995). As explained by the Massachusetts Supreme Court,

> Forfeiture of the constitutional right to counsel results in the defendant's being required to represent himself even though he may wish to be represented by counsel and even though he has not been warned of the dangers of proceeding on his own. Forfeiture is an extreme sanction in response to extreme conduct that imperils the integrity or safety of court proceedings.

> We have previously emphasized the power of the judiciary to control its own proceedings, the conduct of participants, the actions of officers of the court and the environment of the court, which is a power absolutely necessary for a court to function effectively and do its job of administering justice. Trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. Forfeiture is a method of court room management in extraordinary circumstances. The sanction of forfeiture recognizes that a defendant may engage in misconduct that is so serious that it may justify the loss of his right to counsel even if he was not warned that his misconduct may have that consequence.

<u>Commonwealth v. Means</u>, 907 N.E.2d 646, 658-59 (Mass. 2009) (citations and internal quotation marks omitted). <u>See also</u> <u>Cummings</u>, 546 N.W.2d at 419-20 (recognizing that trial courts must have the ability to find that a defendant has forfeited his right to counsel because otherwise "an intelligent defendant . . . could theoretically go through tens of court-appointed attorneys and delay his trial for years").

Our close and painstaking review of the record before us demonstrates that, under the particular facts of this case, the Defendant was making an impermissible attempt to simultaneously represent himself and to have the counsel of his choice assist him in that endeavor.[10] Additionally, the Defendant repeatedly engaged in systematic, calculated, delaying tactics and also engaged in attacks upon his lawyers and the trial judge in a concerted effort to obtain counsel of his own choosing, to which he is not entitled. We have concluded that the Defendant's antics placed the trial court and the Defendant's appointed attorneys in a no-win situation. Our careful, detailed review of the record demonstrates that the Defendant had no intention of following and/or accepting long-standing legal precedent. Instead, from the outset of these criminal proceedings, the Defendant engaged in an intentional pattern of obstinate, dilatory, bullying behavior in an effort to threaten, coerce, and egregiously manipulate the entire judicial system.[11] We will not now hear the Defendant to complain.[12]

Waiver

We first examine the efficacy of the Defendant's efforts to waive expressly his right to counsel. The protocol for express waivers is set forth in Tennessee Rule of Criminal Procedure 44, which provides as follows:

> (a) Right to Assigned Counsel. – Every indigent defendant is entitled to have assigned counsel in all matters necessary to the defense and at every stage of the proceedings, unless the defendant waives counsel.

---

[10] The Defendant had been informed that he could not both represent himself and be represented at trial. The record reflects that, on the morning of trial, the Defendant told the trial court,

> I filed Motions because I was required to, to preserve my rights in the beginning. And then when I asked the Court for legal counsel to assist me, the Court made the assumption that I was turning everything over to them, and the Court at that point denied me the right to file Motions henceforth, at that point. The Court denied me the right to speak and said, "Speak through your attorney," multiple times.

The trial court responded, "Yes, sir, that's correct. I asked that you allow your attorney to speak for you. If you have appointed counsel, your attorney does your speaking for you. I don't hear from the attorney and the defendant."

[11] The Defendant's actions even included retaining a psychological expert who essentially conceded that, even though the Defendant clearly understood his actions, he continually insisted that he could dictate all the actions of any appointed counsel.

[12] Indeed, although the Defendant is contending that the trial court erred in requiring him to proceed to trial pro se, we suspect that, had the trial court refused to allow defense counsel to withdraw and denied the Defendant's request to represent himself, the Defendant most likely would be appealing on that basis.

-26-

(b) Waiver. –

(1) Actions by Court. – Before accepting a waiver of counsel, the court shall:

(A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and

(B) determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters.

(2) Written Waiver. – A waiver of counsel shall be in writing.

(3) Record of Waiver. – An accepted waiver of counsel shall be in the record.

Tenn. R. Crim. P. 44(a), (b). See also Hester, 324 S.W.3d at 30-31 ("For a defendant to exercise his or her right of self-representation at the trial stage of the proceedings, (1) a defendant must make the request in a timely manner, (2) the assertion of the right of self-representation must be clear and unequivocal, and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel."). In this case, we are constrained to hold that the trial court did not comply with Rule 44 and so erred in accepting the Defendant's attempted waiver of his right to counsel.

First, the record before this Court does not reflect that the trial court advised the Defendant in open court that he was entitled to the assistance of counsel at every stage of the proceedings. It may very well be that the trial court did so advise the Defendant during one of the hearings of which a transcript is not included in the appellate record.[13] Moreover, the record does reflect that the Defendant told the trial court during the November 2 hearing that he was aware of his right to counsel. However, Rule 44 is clear and mandatory: "the court *shall* . . . advise the accused in open court of the right to the aid of counsel at every stage of the proceedings." The record before us does not establish that the trial court complied with this mandatory requirement prior to accepting the Defendant's waiver of his right to counsel.

Second, based on the record before us, we cannot hold that the trial court's colloquy with the Defendant, conducted for the determination of whether the Defendant's waiver was knowing and intelligent, was adequate. Our Supreme Court has adopted the following as

---

[13] See footnote 5, supra.

"the proper guidelines to be observed by trial judges, in light of the strong presumption against waiver of the constitutional right to counsel, before a waiver should be found":

> A judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984) (quoting Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)). See also State v. McCary, 119 S.W.3d 226, 256-58 (Tenn. Crim. App. 2003). Based upon a review of the trial court's colloquy with the Defendant at the November 2 hearing, we cannot conclude that the record demonstrates that the trial court adequately canvassed this matter with the Defendant.[14]

Third, the record does not contain a written waiver of counsel by the Defendant as specifically required by Rule 44. Indeed, the record does not indicate any request by the trial court to obtain such a written waiver. While the record indicates that the Defendant may very well have refused to sign such a waiver, the trial court was obliged either to obtain one, or to discover the reasons for the Defendant's refusal to provide one while he was simultaneously requesting verbally to proceed pro se. Thus, based upon the record before us, this Court is unable to affirm the trial court's determination that the Defendant effectively waived his right to counsel in light of the specific requirements of Rule 44.

Accordingly, we are constrained to hold that the trial court erred in determining that the Defendant waived his right to counsel. As to the Defendant's demands on the day of trial that the trial court appoint different counsel to represent him and that the trial court grant a continuance, the record makes clear that these demands were made with the aim of further delay and to further disrupt the proceedings. The trial court's denial of these demands, we

---

[14] This Court previously has opined that trial courts should question a criminal defendant who wishes to proceed pro se pursuant to the guidelines contained in 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed. 1986), also included in the appendix to United States v. McDowell, 814 F.2d 245, 251-52 (6th Cir. 1987). See State v. Herrod, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988).

hold, constituted yet additional confirmations for an implied finding that the Defendant had forfeited his right to counsel.[15]

## Forfeiture

Although we have concluded that the record does not support a finding that the Defendant expressly waived his right to counsel in a manner sufficient to comply with Rule 44 so as to be effective, we hold that the Defendant nevertheless forfeited his right to counsel. As set forth above, our Supreme Court has recognized on more than one occasion that "[a] criminal defendant may be deemed to have forfeited [the right to counsel] when he or she . . . engages in an 'egregious manipulation' of the right to counsel 'so as to delay, disrupt, or prevent the orderly administration of justice.'" Holmes, 302 S.W.3d at 838 (quoting Carruthers, 35 S.W.3d at 550). The record in this case demonstrates that the Defendant's pretrial conduct was egregiously manipulative and that he deliberately engaged in this conduct with the aim of delaying, disrupting, and/or preventing the orderly administration of justice.

The Defendant's repeated pro se efforts to delay the disposition of his case, both while he did not have counsel and while he did, began early and continued systematically throughout the course of the twenty-six month period that elapsed between the date of the offenses and the date of trial. He sought pro se and obtained two continuances of his preliminary hearing. He subsequently sought pro se and obtained numerous continuances of both the date to file pretrial motions and his trial date while he was allegedly seeking to retain legal counsel. Six months after he was indicted (and almost sixteen months after committing his crimes), and still without the appearance of any retained lawyer, the Defendant established his indigency. The trial court immediately appointed counsel. Within just a few weeks, the Defendant sought to have his lawyer removed from his case, claiming that his lawyer was "unstable," had "threaten[ed]" him, "attempted to coerce [the Defendant]

---

[15] Indeed, although the trial court did not use the word "forfeiture" before or during the trial (insofar as the record before us indicates), the trial court specifically ruled that the Defendant had forfeited his right to counsel in its lengthy written order denying the Defendant's motion for new trial. In this order, the trial court found, among other things, that the Defendant's "complaints about appointed counsel were unwarranted and in some instances not true"; that the Defendant "attacked counsel in an attempt to manipulate continuances"; that his conduct "was an attempt to be manipulative of the judicial process"; that he "used delaying tactics to postpone his trial"; and that, during the course of the prosecution, the Defendant "filed four civil suits against people involved in this case." The trial court concluded,

> The defendant forfeited or abandoned the right to counsel by repeatedly filing motions to have court-appointed counsel removed, his abusive conduct toward counsel, refusing to listen to counsel, and continuing to represent himself after counsel had been appointed. Defendant repeatedly refused to cooperate with counsel, and his conduct was egregiously manipulative and abusive of the judicial process.

to lie to the court," and "would not keep information [given to him by the Defendant] in confidence." These assertions include allegations of unethical conduct. See Tenn. Sup. Ct. R. 8 RPC 1.2(d), 1.6(a). The trial court immediately appointed another lawyer. In less than two weeks, the Defendant sought to have this lawyer removed, as well. Additionally, the Defendant kept trying to have Gary Antrican, the District Public Defender, appointed to his case, in spite of being repeatedly informed that the Public Defender's office could not represent him due to a conflict.[16] Thus, this conduct by the Defendant was yet another example of his intentional, ongoing efforts to delay, dictate, and disrupt any and all proceedings related to this case.

The Defendant did not limit his pro se efforts to the trial court. He also filed pro se multiple pleadings with this Court, demanding that the trial court's orders be overturned, that stays be issued, and that further continuances be granted.[17] Nor did the Defendant limit his pro se efforts to attempts at delay. When the trial court denied the defense motion that the trial judge recuse himself, the Defendant filed a lawsuit against the trial judge in federal court.[18] The Defendant also named Ms. Mills as a defendant in the federal lawsuit and then claimed that the resulting conflict required her to be removed as his elbow counsel, while insisting that he was entitled to new counsel.[19]

Nor was the Defendant content with filing civil lawsuits in an attempt to manipulate the proceedings. He informed the trial court that he had filed complaints against both Mr. Robbins and Ms. Mills with the Board of Professional Responsibility. He also told the trial court that he had filed a complaint with the local police department against Ms. Mills for an alleged assault upon him. In his pleading filed on the day of trial, the Defendant threatened to file against Ms. Mills "an additional complaint with the Tennessee State Bar Association and quite possibly a civil lawsuit against her for ineffective assistance of counsel, and a claim on her bond."

---

[16] The United States Supreme Court has made clear that the Sixth Amendment right to counsel does not permit a defendant to "insist on representation by an attorney . . . who declines to represent the defendant." Wheat v. United States, 486 U.S. 153, 159 (1988).

[17] Many of these pro se filings were submitted at times when the Defendant was represented by appointed counsel.

[18] For this Court to hold that a trial judge must recuse him or herself merely because the Defendant files a lawsuit against the trial judge would set a dangerous precedent inviting additional frivolous litigation and forum shopping.

[19] The record also contains a copy of pro se pleadings that the Defendant filed in a civil lawsuit brought by him against the victims in this case, Barry Laxton and Nick King.

-30-

The Defendant also engaged in intentionally manipulating the attempt to determine if he was competent to stand trial. He failed to appear for his court-ordered appointment with Dr. Nichols and then failed to appear at the resulting show cause hearing. After the Defendant was taken into custody and transported to Dr. Nichols' office, and after the Defendant had the opportunity to review the resulting recommendation for further forensic evaluation, the Defendant hired his own psychologist[20] and was able to present himself in such a way that the ensuing evaluation was at complete odds with Dr. Nichols' evaluation and was, additionally, markedly flattering. In fact, the Defendant's tactic of obtaining a competing psychological evaluation demonstrates a knowledge of court procedure far beyond that of most defendants acting without an attorney.

The Defendant also presented inconsistent narratives to the trial court. After writing a letter "firing" Ms. Mills, the Defendant claimed to the trial court that it was she who initiated her withdrawal. After telling the trial court in very clear terms that he wanted to proceed pro se with advisory counsel, he subsequently told the court that he had not waived his right to counsel and demanded that counsel be appointed to represent him. As our Supreme Court has observed, "[d]isingenuous invocations of the right of self-representation that are designed to manipulate the judicial process constitute an improper tactic by a defendant and are not entitled to succeed." Hester, 324 S.W.3d at 33. And, on the day of trial, the Defendant demanded yet another continuance.

Last, but by no means least, the Defendant demonstrated his complete unwillingness to cooperate with his lawyers. The record makes crystal clear that, had the trial court appointed even more lawyers in succession, the Defendant would have manufactured reasons to force each of them to seek withdrawal.

A panel of this Court considered similar conduct in State v. Willis, 301 S.W.3d 644 (Tenn. Crim. App. 2009), where the trial court made the following findings:

So, it appears he's [forfeited] his right to counsel because he's persistently demanding counsel of his choice and he refuses to cooperate. He refuses to talk to [his lawyers], refuses to communicate. He has refused to talk to the experts to [sic] evaluation, and – this is quite serious. [Denying the appointment of further counsel] should be done only when it gets to the point that appointing additional counsel would be futile . . . . [H]e knows how to put [the case] off again. He knows to file a complaint to the Board of Professional Responsibility about his lawyers, and he knows he can sue his lawyers. But, he – he hasn't shown the court that [the lawyers] have even begun to do

---

[20] The record does not reveal how, after establishing his indigency, the Defendant procured the funds to hire Dr. Ciocca.

anything other than what was in his best interest. So, the conclusion the court reaches . . . is that [the defendant has] egregiously manipulated the constitutional right to counsel resulting in delay, disruption and it's prevented the orderly administration of justice.

Id. at 649. This Court affirmed the trial court's decision, holding that

the record supports a finding of forfeiture. The trial court found that the defendant used the tactic of suing his lawyers or filing complaints against them with the Board of Professional Responsibility as a means of coercing the court into discharging counsel and that the pattern was for the tactic to be employed as trial dates approached. The trial court gave the defendant ample opportunity to show via argument, documents, and testimony that he was justified in complaining about counsel's performance. Nevertheless, the defendant neither articulated nor established any basis for complaint against any of his attorneys. Additionally, the record shows that the defendant refused to communicate with counsel and to cooperate with mental health evaluators. His conduct was egregiously manipulative and abusive of the judicial process; it warrants a finding that he forfeited his right to counsel.

Id. at 652.

As did the defendant in Willis, the Defendant in this case used the tactic of refusing to communicate and/or cooperate with his lawyers; filing lawsuits against his lawyers; filing complaints with the Board of Professional Responsibility against his lawyers; and refusing to cooperate with a court-ordered evaluation. Additionally, the Defendant filed with law enforcement a complaint of assault against one of his lawyers; sued the trial judge; sued the district attorney; and sued the victims. This course of conduct was an egregious manipulation of the judicial system, and of the constitutional rights afforded to criminal defendants, in order to delay, disrupt, and prevent the orderly administration of justice. The Defendant's egregious misconduct constituted a forfeiture of his right to counsel, over and above his attempted express waiver of same. See, e.g., United States v. Moore, 706 F.2d 538, 540 (5th Cir. 1983) (holding that the defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a knowing and voluntary waiver of counsel"); Brickert v. State, 673 N.E.2d 493, 496 (Ind. Ct. App. 1996) (holding that the defendant lost his right to counsel by engaging in conduct designed to frustrate the judicial process and avoid or delay a trial); Montgomery, 530 S.E.2d at 69 (defendant forfeited his right to counsel when, over the course of fifteen months, he released appointed counsel twice and subsequently assaulted retained counsel after the trial court refused to grant further continuances); Cummings, 546 N.W.2d at 418-20 (defendant forfeited his right to counsel where he consistently refused to cooperate and constantly

complained about counsel's performance to manipulate, disrupt, and delay the proceedings). Therefore, as a result of the Defendant's own conduct, the Defendant is entitled to no relief on this basis.

In Holmes, our Supreme Court set forth four factors that should be considered in determining the validity of a forfeiture. See Holmes, 302 S.W.3d at 839. However, we note that this case stands in a different procedural posture than Holmes and, also, that a different quality of conduct was at issue in that case. In Holmes, the trial court ruled – without the benefit of an evidentiary hearing – that the indigent defendant had forfeited his right to counsel after the defendant had made an ambiguous threat to his first appointed lawyer and then, two weeks later, jabbed his finger into his lawyer's eyeglasses. That is, the Holmes case dealt with a defendant who had physically assaulted his first lawyer and who had then been deprived of counsel without being heard. In conducting its analysis, the Court considered four non-exclusive factors as relevant to a determination of whether the defendant should be deemed to have forfeited his right to counsel. These factors include "(1) whether the defendant has had more than one appointed counsel; (2) the stage of the proceedings, with forfeiture 'rarely . . . applied to deny a defendant representation during trial'; (3) violence or threats of violence against appointed counsel; and (4) measures short of forfeiture have been or will be unavailing." Id. (citing and quoting Means, 907 N.E.2d at 659-661). In concluding that the defendant had not engaged in sufficiently egregious conduct to justify the trial court's finding of forfeiture, our Supreme Court emphasized that the record did not indicate that the defendant had taken the actions he had in order "to delay or disrupt the proceedings, . . . [or] that [the] Defendant took any other actions aimed at manipulating the court or obstructing the orderly progression of his trial." Id. at 847.

In this case, of course, we do not have a physical assault upon appointed counsel. However, "[v]iolence is not the *sine qua non* of extremely serious misconduct." Bultron v. State, 897 A.2d 758, 766 (Del. 2006). We agree with the State and the trial court that the Defendant's conduct toward his lawyers was abusive and outrageous. The Defendant asserted that he filed complaints with the Board of Professional Responsibility against both Mr. Robbins and Ms. Mills. He filed a federal lawsuit against Mr. Robbins and Ms. Mills. He asserted that he had filed a complaint with the police against Ms. Mills, claiming that she had assaulted him. He threatened to file additional actions against her. He filed pleadings with the trial court, which are, of course, a matter of public record, accusing Mr. Robbins of being unstable, of threatening him, of refusing to keep matters confidential, and of encouraging him to lie to the court; and accusing Ms. Mills of assaulting him and being "lazy and worthless." In short, the Defendant committed "acts of violence" against the professional reputations of each of his two appointed lawyers.

As to the remaining three factors, we emphasize that the Defendant was appointed two different lawyers after he spent months allegedly trying, unsuccessfully, to hire his own

-33-

counsel. The Defendant expressed great dissatisfaction with both of these attorneys, both in pro se pleadings and in the November 2 evidentiary hearing. The Defendant's allegations were contradicted, however, by Mr. Robbins' affidavit and Ms. Mills' assertions in her motion to withdraw, which the trial court impliedly accredited.[21] We also consider relevant to this factor that the Defendant made repeated demands for the appointment of the Public Defender, whom he knew was unavailable due to a conflict.[22] Moreover, the record is replete with examples of the Defendant refusing to recognize his role as opposed to the role of his attorney.

As to the second factor, the Defendant was, indeed, required to proceed to trial pro se with the assistance of advisory counsel. As set forth above, however, the Defendant had requested just this arrangement two weeks previously. The Defendant's real complaint following the trial court's grant of his request was that the trial court did not appoint as advisory counsel a lawyer of the Defendant's choice. We reiterate, however, that an indigent criminal defendant is not entitled to the lawyer of his choice, and he may not use his dissatisfaction with successive appointed counsel as a tool to repeatedly delay his trial. See, e.g., United States v. Green, 388 F.3d 918, 921 (6th Cir. 2004) (recognizing that the "'persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a valid waiver of counsel'") (quoting United States v. Henderson, No. 98-5216, 1999 WL 313842, at *2 (6th Cir. May 3, 1999)); Moore, 706 F.2d at 540 (same).

Finally, as to the fourth factor, we have no hesitation concluding that measures short of requiring the Defendant to proceed pro se would have been unavailing. The Defendant's entire course of conduct demonstrates beyond any doubt that he fully intended to control the proceedings and to fire and/or intimidate and/or refuse to cooperate with any lawyer – or any judge, for that matter – that did not obey his every command. Cf. Holmes, 302 S.W.3d at 847-48 (reversing trial court's finding that defendant forfeited his right to counsel in part because the record did not indicate that defendant took actions "to delay or disrupt the proceedings" or "aimed at manipulating the court or obstructing the orderly progression of

---

[21] The trial court expressly accredited the lawyers' version of events over the Defendant's in its order denying the Defendant's motion for new trial.

[22] We note that the conflict appears to have arisen out of the Defendant's desire to utilize one of the assistant public defenders as a witness at his trial because the Defendant believed that this attorney could offer proof that the aggravated kidnapping charges were the result of prosecutorial misconduct. The Defendant's belief was based on a conversation the attorney apparently overheard many months after the crimes on trial had occurred. The Defendant's repeated attempts to have the District Public Defender represent him while simultaneously intending to call one of the assistant public defenders as a witness to testify on his behalf is one more example of the Defendant's profound misunderstanding of the role of an attorney who is representing a criminal defendant, the attorney's ethical obligations, and/or the Defendant's determination to manipulate the system.

his trial"). The Defendant demonstrated himself to be "disruptive, contumacious, [and] stubbornly defiant," Means, 907 N.E.2d at 659, and deserving of the extreme sanction of forfeiture of counsel. See Green, 388 F.3d at 922 (upholding trial court's refusal to appoint another lawyer where the defendant had accused his three previous attorneys of conspiring with the government against him, refusing to allow himself to be represented by counsel, and insisting that the trial court appoint a lawyer to act as his co-counsel); Bultron, 897 A.2d at 766 (upholding trial court's finding of forfeiture where the defendant engaged in "continuing profanity and insulting conduct directed toward his counsel after jury selection and his refusal to make peace with counsel" indicating that the defendant "intended to force his attorney to withdraw to prevent his trial from going forward after the [trial court] had denied [the defendant's] request for substitute counsel"); Cummings, 546 N.W.2d at 418-20 (upholding forfeiture where defendant consistently refused to cooperate with any of his court-appointed lawyers, constantly complained about their performance, and where the record demonstrated that the defendant's "behavior was manipulative and disruptive and that his continued dissatisfaction was based solely upon a desire to delay"). The Defendant is entitled to no relief on this issue.

*Evidentiary Rulings*

The Defendant next complains that the trial court summarily sustained numerous evidentiary objections lodged by the State during the trial "so that [the Defendant] could not present his case." He contends that these "objections were easily reversible by someone who knew the rules of evidence." We disagree.

This Court will not overturn a trial court's rulings on the admissibility of evidence absent an abuse of discretion. See State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. Even where a trial court errs in a ruling on the admissibility of evidence, a defendant is not entitled to relief if the error is harmless. See State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008); Tenn. R. App. P. 36(b).

The Defendant set forth six specific examples of allegedly erroneous evidentiary rulings by the trial court. We will address each of these in turn.

The first error for which the Defendant offers specific argument occurs during the Defendant's cross-examination of Sergeant Daniel Walls of the Tipton County Sheriff's Office. Sgt. Walls had testified on direct examination that he had responded to the crime scene on a call received at 7:05 p.m. He spoke with the Defendant and acquired a Glock 9mm semiautomatic pistol that the Defendant had used during the encounter with Laxton and

King. Sgt. Walls also recovered from the Defendant the holster that the Defendant had taken. Sgt. Walls testified that he assisted in trying to find the body of the wolf-hybrid that had been shot but that they did not find it.

On cross-examination by the Defendant, Sgt. Walls acknowledged that the Defendant had also given him the .22 rifle that evening. The Defendant then tried to elicit from Sgt. Walls the statements that the Defendant had made to him that evening. The prosecution objected on the grounds of hearsay, and the trial court sustained the objection. The Defendant now asserts in his brief that this testimony should have been admitted under the exception to the hearsay rule for admissions of party-opponents. See Tenn. R. Evid. 803(1.2).

Tennessee Rule of Evidence 803(1.2) allows the admission of "[a] statement offered against a party that is . . . the party's own statement . . . ." While we agree that the Defendant was trying to elicit proof of a statement to use against the State, we disagree that the statement was made by anyone representing the State. Rather, the statement the Defendant was trying to elicit was the Defendant's own, not that of a "party-opponent." Accordingly, the testimony that the Defendant was trying to elicit did not meet the definition of this exception to the hearsay rule, and the trial court therefore committed no error in excluding it. This issue is without merit.[23]

The Defendant next refers in his brief to page 329 of the transcript of the trial, complaining that his "examination was objected to as leading – but this is an adverse witness." Our review of the cited page reveals that the prosecutor was conducting his direct examination of Barry Laxton, one of the victims, and asked, "Are you certain that that wolf was charging you?" Laxton responded, "Yes, sir." The prosecutor next asked, "And endangering you at the time?" At that point, the Defendant interjected, "Objection to leading." The trial court overruled the objection.

While the Defendant mischaracterizes this episode in his brief, we agree that the prosecutor's question to the witness was leading. Generally, leading questions "should not be used on direct examination of a witness." Tenn. R. Evid. 611(c)(1). Any error by the trial court in overruling the objection, however, was completely harmless. Therefore, the Defendant is entitled to no relief on this issue.

The Defendant next complains about the trial court sustaining an objection by the prosecution during the Defendant's cross-examination of Nick King. The Defendant was

_____

[23] Indeed, the Defendant was trying to elicit proof of his own prior consistent statement. As such, the excluded testimony met the definition of hearsay, see Tenn. R. Evid. 801, and was therefore inadmissible absent an applicable exception. See Tenn. R. Evid. 802.

trying to establish that King was not afraid of dogs. The prosecutor objected that this line of questioning was irrelevant and the trial court agreed. So do we. Whether or not King was afraid of dogs had no relevance to establishing any element of either the Defendant's crimes or the Defendant's alleged defenses thereto.[24] "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. This issue is without merit.

We arrive at the same conclusion regarding the Defendant's complaint about the trial court not allowing him to cross-examine King "about King's divorce complaint by his wife where she states that he has 'a quick and unpredictable temper and often becomes enraged at minor issues.'" Allegations in a divorce complaint clearly are hearsay and are therefore inadmissible. See Tenn. R. Evid. 801, 802. This issue is without merit.

Similarly, the Defendant complains that the trial court did not allow him to introduce evidence about his wolf-hybrids' propensity (or lack thereof) to bite the veterinarian or the veterinarian's staff. Again, the trial court was correct in ruling this information to be irrelevant. This issue is without merit.

As to the Defendant's remaining complaints about evidentiary rulings, which the Defendant identifies only by reference to page numbers in the trial transcript, these allegations of error are waived as not supported by argument or legal authority. See Tenn. Ct. Crim. App. R. 10(b). The Defendant is entitled to no relief on his allegations of evidentiary errors.

*Juror Issue*

The Defendant complains that one of the jurors ("the Juror") was permitted to serve as an alternate after the Defendant learned "in the middle of the trial" that she was the mother-in-law of the officer who arrested the Defendant after he was indicted for aggravated kidnapping. The Defendant alleges in his brief to this Court that the Juror "never revealed this information during the voire [sic] dire" and that the trial court "did not hold a hearing or interrogate the juror as to her statements, if any, in the jury room." The Defendant moved for a mistrial on the second day of trial on the basis of the Juror's relationship with the officer, which the trial court denied. Later, after repeated requests by the trial court that the Defendant call his next witness, the Defendant asserted the following in open court and in front of the jury:

> I call Officer Jeff Fletcher, whose mother-in-law is sitting in spot number seven on the jury. He is a material fact witness. He is the arresting officer. She was asked under voir dire if she was related to anybody in

---

[24] Moreover, the animals at issue in this case were wolf-hybrids – not dogs.

government in Tipton County. She did not notify this Court. This Court was notified on Friday, as well as the prosecution, that she was sitting in the jury, potentially tainting the jury. Her daughter is married to an officer who made the arrest, who has a federal lawsuit . . .

. . .

. . . who I have a two million dollar civil lawsuit against.

The Defendant renewed his motion for a mistrial.

After the trial court excused the jury, the judge explained to the Defendant:

There are several ways to handle the matter with regard to the juror. There is an alternate. She can act as the alternate if that's an agreement between the State and the defendant. Otherwise, the alternate would be selected at random, by random draw at the conclusion of the trial.

Both the State and the defense were given an opportunity to ask questions of the jurors. In the Court's opinion the juror did not perjure herself. She was not asked a question that she had to respond to in such a way that she did not respond properly.

I don't know whether she knew anything about her son-in-law's activities until you just stated whatever they were right there in front of her; that is, you've sued her son-in-law. She may not even have been aware of that fact, so, but now I think it would be very difficult for her to sit as a juror since you've made all of those statements in front of the jury, Mr. Parsons.

In response to the trial court's query of whether he would like the Juror designated an alternate, the Defendant requested that he be allowed "to interrogate every member of the jury to find out what they know, when they knew it, and who told it to them, relating to anything juror seven said to them during the entire event to make sure that we purge anybody who has been falsely tainted." When the trial court denied the Defendant's request, the Defendant renewed his demand for a mistrial. The trial court denied this request, as well, explaining,

[t]he jurors are instructed, and have been instructed several times, not to discuss the case among themselves or any aspect of the case among themselves until they've heard all of the proof, received the charge of the law, and retired to deliberate. Only then should they begin discussing the case.

So I'm assuming that the jury follows their oath and have not discussed any aspect of the case among themselves.

Eventually, the trial court returned the jury to the courtroom and issued the following instruction:

But the defendant, the last time you were in the courtroom a few minutes ago, made an outburst directed at one of the – one of your members. I'm going to ask the remaining twelve jurors to please disregard that outburst. Please don't take it into consideration in any way when you retire to decide the case.

I think it might be very difficult for [the Juror] to disregard it, since it was addressed specifically at you. I want to apologize for it, but I'm going to designate you as the alternate juror in the matter so that we can go forward with the other twelve jurors. But again, I'm going to ask the other twelve jurors to please just disregard it, not let it influence you one way or the other.

The trial court then excused the Juror, and the trial resumed.

First, setting aside the distinct possibility that the Defendant's statements were intended to taint the jury,[25] we note that the Juror indicated on her jury questionnaire, which was admitted for identification purposes during the jury-out hearing, that she had a son-in-law employed by law enforcement. Thus, any surprise claimed by the Defendant is either his own fault for not reviewing the questionnaire closely, or simply disingenuous. Additionally, although the Defendant participated in the voir dire of the venire, he did not pursue this line of questioning.[26] He did not challenge the Juror peremptorily or for cause. Nor did he exercise all of his peremptory challenges.[27] As pointed out by the State, "[i]t is only where a defendant exhausts all of his peremptory challenges and is thereafter forced to accept an incompetent juror can a complaint about the jury selection process have merit." State v. Reid, 91 S.W.3d 247, app. 291 (Tenn. 2002). Additionally, the Defendant has not demonstrated any prejudice resulting from the Juror's sitting on the jury before the trial court

_____

[25] We note that the Defendant's actions surrounding this issue are yet another example of the Defendant's innumerable attempts to "egregiously manipulate" the judicial system.

[26] The Defendant asked if anyone in the venire had "now or ever done work for any municipality, city, county, federal, or state government within the confines of Tipton County? Ever worked in any capacity with the government in Tipton County? Have a spouse that works for government in Tipton County?"

[27] The Defendant was entitled to eight peremptory challenges, Tenn. R. Crim. P. 24(e)(2), but he used only six.

excused her. See Curtis v. State, 909 S.W.2d 465, 469 (Tenn. Crim. App. 1995) (holding that the defendant was not denied his right to an impartial jury, although there was evidence that one or more of the jurors had some prior knowledge of his reputation or criminal history, where the defendant was aware of this at the time of jury selection but did not exercise all of his peremptory challenges and did not show any prejudice that resulted from any such knowledge a juror may have had). Finally, any possible issue was resolved by the trial court excusing the Juror. This issue is without merit.

*Sufficiency of the Evidence*

In his fourth issue, the Defendant asserts that the jury "failed to follow" its instructions, apparently because the jury rejected the Defendant's theory that he was "only trying to make a citizen's arrest and stop the shooting." The Defendant's issue raises, in essence, a challenge to the sufficiency of the evidence.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). In conducting this analysis, we afford the State the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Issues regarding witness credibility, the weight to be given the proof, and factual issues raised by the evidence are matters to be resolved by the trier of fact. Id. Because a guilty verdict replaces the presumption of innocence with a presumption of guilt, the defendant has the burden on appeal of demonstrating why the evidence is insufficient to support the jury's verdict. State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted the Defendant of two counts of aggravated assault, defined as relevant to this case as "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury," Tenn. Code Ann. § 39-13-101(a)(2) (2006), committed by the use or display of a deadly weapon. Id. § 39-13-102(a)(1)(B) (2006). See State v. Koffman, 207 S.W.3d 309, 321 (Tenn. Crim. App. 2006). The proof at trial established that the Defendant held Barry Laxton and Nick King at gunpoint and threatened to shoot them. Laxton testified that he was "[t]errified." King testified that he was "afraid" and that he thought that "for sure one of us, if not both of us, were going to be dead." This evidence is sufficient to sustain the Defendant's convictions.

The jury also convicted the Defendant of two counts of theft of property having a value of $500 or less. A person commits theft when, with the intent to deprive the owner of property, "the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2006). See State v. Lewter, 313 S.W.3d 745, 747 n.3, 749-50 (Tenn. 2010). The proof in this case demonstrated that the Defendant took Laxton's rifle and King's holster with the requisite intent and without either man's consent. This proof is sufficient to sustain the Defendant's convictions.[28] That the Defendant subsequently turned these items over to the police does not exonerate the Defendant.

Finally, the jury convicted the Defendant of one count of burglary of a vehicle. Burglary of a vehicle is committed when a person enters another's vehicle, without their consent, and commits theft. See Tenn. Code Ann. § 39-14-402(a)(4) (2006); see also State v. Jeffrey Thomas Pardue, No. M2009-01163-CCA-R3-CD, 2010 WL 4352931, at *2 (Tenn. Crim. App. Nov. 4, 2010). The proof at trial established that the Defendant entered King's pickup truck without King's consent and committed the theft of King's holster. This proof is sufficient to sustain the Defendant's conviction.

The Defendant's real complaint is that the jury rejected his defenses of self-defense and citizen's arrest. Both of these defenses were charged to the jury. As to self-defense, the trial court charged the jury as follows:

> Included in the defendant's plea of not guilty is his plea of self-defense. If the defendant was not engaged in unlawful activity, and if the defendant was in a place where he had a right to be, he would have no duty to retreat before threatening or using force against the alleged victim, when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's or attempted use of unlawful force.
>
> If the defendant was not engaged in unlawful activity and was in a place where he had right to be, he would also have no duty to retreat before threatening or using force intended or likely to cause serious bodily injury . . .

---

[28] Laxton did not testify about the value of his rifle, nor did King testify about the value of his holster. The proof was, however, sufficient to prove that the Defendant committed the theft of these items. For these crimes, the Defendant was convicted of two Class A misdemeanors, the least serious of the theft offenses. See Tenn. Code Ann. § 39-14-105(1) (2006). Where the State fails to prove the value of an item in a prosecution for theft, but the evidence is sufficient to establish the theft, the defendant may be convicted of the Class A misdemeanor grade of theft. See State v. Darryl Keith Robinson, No. W2008-02069-CCA-R3-CD, 2010 WL 376627, at *14 (Tenn. Crim. App. Feb. 3, 2010), perm. appeal denied (Tenn. June 16, 2010) (reducing grade of the defendant's theft offense from a Class C felony to a Class A misdemeanor because the State failed to establish the value of the vehicle stolen by the defendant).

[i]f the defendant had a reasonable belief that there was an immediate danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real or honestly believed to be real at the time, and the belief or danger was founded upon reasonable grounds.

In determining whether the defendant's threat of force in defending himself was reasonable, you may consider, not only his threat or use of force, but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there w[ere] reasonable grounds for the defendant to fear death or serious bodily injury from the alleged victim include but are not limited to any previous threats of the alleged victim made known to the defendant, the character of the alleged victim for violence when known to the defendant, the animosity of the alleged victim for the defendant as revealed to the defendant by previous acts and words of the alleged victim, and the manner in which the parties were armed, and their relative strengths and sizes.

The threat of force against the alleged victim would not be justified if the defendant provoked the alleged victim's use or attempted use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the alleged victim the intent to do so, and the alleged victim nevertheless continued to use unlawful force against the defendant.

. . .

If evidence is introduced supporting self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find the defendant not guilty.

As to citizen's arrest, the trial court instructed the jury as follows:

A private person may arrest another for a public offense committed in the arresting person's presence, when the person arrested has committed a felony although not in the arresting person's presence, or when a felony has been committed and the arresting person has reasonable cause to believe that the person arrested committed the felony. A private person making an arrest shall at the time of the arrest inform the person arrested of the cause of the arrest unless the person is in the actual commission of the offense.

To make a citizen's arrest a citizen is not required to be 100 percent certain that the suspect is guilty of the crime. The citizen is required to have probable cause to believe that the suspect has committed a crime. A private person who has arrested another for a public offense shall, without unnecessary delay, take the arrested person before a magistrate or deliver the arrested person to a law-enforcement officer.

A private person, in making an arrest authorized by law, may use force reasonably necessary to accomplish the arrest of an individual who either flees or resists that arrest, provided that a person cannot use or cannot threaten to use deadly force, except to the extent authorized under the self-defense law.

Probable cause to believe that arrest (sic) was committed will not justify an arrest by a private person when, in fact, no offense was committed. A private person makes or attempts to make an arrest at his own peril.

A citizen's authority to effectuate a citizen's arrest does not permit the citizen to violate the law. For example, a citizen attempting to effectuate a citizen's arrest may be properly convicted of speeding while attempting to effectuate the arrest, because the citizen's authority to effectuate an arrest does not allow the citizen to violate the law.

The Defendant makes no complaint about these instructions, and they are in accord with the relevant statutes. See Tenn. Code Ann. §§ 39-11-611(b) (Supp. 2007); 39-11-621 (2006); 40-7-109 (2006).

It is the jury's prerogative to determine the weight of the evidence supporting and repudiating the alleged defenses. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). In this case, the jury acted well within its authority when it rejected the Defendant's theories of defense and found him guilty of the charged offenses. This issue is without merit.[29]

---

[29] We note that this is not a case in which the Defendant was convicted on all charged offenses. To the contrary, the jury acquitted the Defendant of aggravated kidnapping, kidnapping, and false imprisonment as to King, and also acquitted the Defendant of aggravated kidnapping and kidnapping as to Laxton. The jury also deadlocked on the lesser offenses of attempted aggravated kidnapping, attempted kidnapping, and attempted false imprisonment as to King, and also deadlocked on the lesser offenses of false imprisonment and attempted aggravated kidnapping, attempted kidnapping, and attempted false imprisonment of Laxton.

After the trial, the trial court appointed new counsel for the Defendant. Prior to the sentencing hearing, the Defendant's counsel filed a motion for judicial diversion, including a certificate of eligibility. At the sentencing hearing, the Defendant testified, stating that he had no prior criminal convictions; that he had purchased materials to build a secondary fence around the primary enclosure where he kept his wolf-hybrids; and that he wanted to engage in a community outreach program to educate his neighbors and others about the good nature of his wolf-hybrids. He explained his criminal actions as resulting from the strong provocation of "witnessing [his] dog being shot and killed right in front of [him], her dying at [his] feet, [his] wife being shot at, and bullets flying past [his] head." He testified that he "certainly . . . was under stress, but [he] would say that [his] actions were reasonable and restrained." He explained his cooperation with authorities during the investigation, emphasizing his "immediate" surrender of the rifle and holster he took. He stated that he was sorry the incident had occurred. He also testified that he had no physical or mental health problems.

On cross-examination, the Defendant adamantly reiterated his view that he had acted within his legal rights and had done nothing wrong. He, however, acknowledged that his wolf-hybrids had gotten out of their enclosure before the day in question and that he had had previous confrontations with people as a result. The Defendant persistently characterized his difficulties as being politically motivated and resulting from the hate and crimes of his neighbors.

The trial court denied the Defendant's request for judicial diversion, finding that the Defendant "still fails to appreciate the wrongfulness of his actions, where he held a loaded handgun to the head of the victims and threatened to kill them." As to sentencing, the trial court stated the following:

> The Court has considered the evidence received at trial, the evidence received today, the presentence report, the principles of sentencing, and arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the defendant on the mitigating factors, the statement that the defendant made in his own behalf, and the need to impose a sentence to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment.

> The defendant is a standard offender.

> The Court finds there are no statutory mitigating factors that apply.

The victims in this case were threatened with serious bodily injury. The defendant put a weapon to the head of the victims, told them he would kill them if they did not do as he demanded.

There was provocation, according to the defendant's view, but the jury rejected that view.

The defendant acted out of anger. The jury heard the actual tape recording of the incident itself. The defendant acted with the belief he could do whatever he wanted. The jury accredited the testimony of the victims, that the wolf was charging and that Mr. Laxton was justified in his actions.

Nick King had done nothing toward the defendant. He was working and minding his own business, yet [the Defendant] placed a gun on him, threatened him, and continues to express that everyone else is in the wrong and that he acted appropriately.

Despite what the defendant alleges, there are not substantial grounds, in this Court's opinion, to excuse or justify his conduct.

The Court finds it's a proper case to sentence the defendant, however, to the presumptive or minimum sentence, and the Court sentences the defendant to three years [on each of the aggravated assault convictions] . . . to one year [on the burglary of a vehicle conviction], and to 11 months and 29 days . . . for the misdemeanor offenses of theft.

The Court finds, from the evidence, that the defendant is a dangerous offender. His behavior indicates little or no regard for human life. He had no hesitation about committing a crime in which the risk to human life was high.

He accosted his neighbors with a loaded weapon, threatening to kill them if they didn't do as he demanded. He held them under gun or threat of gun while he took their property.

And the Court finds that consecutive sentencing is reasonably related to the severity of the offenses committed, that it serves the need to avoid deprecating the seriousness of these offenses from the actions of the defendant, serves to protect society from further criminal acts by the defendant who resorted to aggravated criminal conduct, and are generally congruent with the principles of sentencing.

The consecutive sentences are justly deserved in relation to the seriousness of the offenses and [are] no greater than deserved for the offenses committed.

So the Court sentences the defendant to [serve the felony sentences consecutively] for an effective sentence of seven years. The misdemeanor sentences will run concurrent with the first three-year sentence.

The Court finds that alternate sentencing is not appropriate in this case. The offenses involved a handgun. The defendant is not an eligible offender. He was convicted of offenses involving crimes against a person, violent offenses, and offenses in which the use or possession of a weapon was involved. And therefore, under T.C.A. 40-36-106, is not an eligible candidate for alternate sentencing.

The Court further doesn't feel it's a proper case for probation, and that confinement is necessary to protect society and avoid deprecating the seriousness of these offenses.

On appeal, the Defendant challenges only the trial court's denial of judicial diversion and the trial court's refusal to apply mitigating factors. We hold that the Defendant is entitled to no relief on either of these issues.

Judicial Diversion

Judicial diversion is a form of "legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999) (citing Tenn. Code Ann. § 40-35-313(b)). A defendant is not entitled to a presumption that he or she is a favorable candidate for judicial diversion, see State v. Anderson, 857 S.W.2d 571, 573 (Tenn. Crim. App. 1992), and we will reverse a trial court's denial of judicial diversion only for an abuse of discretion. See State v. Turco, 108 S.W.3d 244, 246 n.5 (Tenn. 2003) (citing State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)). Upon review of a denial of judicial diversion, we will accord the trial court the benefit of its discretion if "any substantial evidence to support the refusal exists in the record." Anderson, 857 S.W.2d at 572 (internal quotation marks omitted).

A trial court must consider several factors in determining whether to grant judicial diversion: (1) the defendant's amenability to correction; (2) the circumstances of the offenses; (3) the defendant's criminal history; (4) the defendant's social history; (5) the

defendant's physical and mental health; (6) special and general deterrence value; and (7) whether judicial diversion will serve the ends of justice. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Where the trial court fails to consider all of these factors, we consider them de novo to determine whether the trial court abused its discretion in denying judicial diversion. State v. Jonathan B. Dunn, No. M2005-01268-CCA-R3-CD, 2006 WL 1627335, at *9 (Tenn. Crim. App. June 12, 2006).

In this case, the trial court denied judicial diversion based on the circumstances of the offenses and the Defendant's refusal to recognize that his actions were wrong. The record does not reflect that the trial court addressed any of the other factors relevant to a request for judicial diversion. Thus, our review is de novo. A de novo review of the factors, however, indicates that the trial court's decision is supported by substantial evidence and that the trial court did not abuse its discretion in denying judicial diversion. The Defendant's amenability to correction is highly questionable given his refusal to acknowledge that his actions were wrong and given his persistent and unrelenting attempts to blame others for his conduct. See State v. Lonna K. Brewer, No. M2005-01876-CCA-R3-CD, 2006 WL 2206059, at *6 (Tenn. Crim. App. Aug. 3, 2006) (affirming trial court's denial of judicial diversion where the defendant's "failure to accept responsibility and her attempt to shift blame reflects poorly on her rehabilitation potential, and the trial court obviously gave great weight to this factor"). We also agree with the trial court that the circumstances of the instant offenses are very troubling. Upset because Laxton had shot one of the Defendant's wolf-hybrids, which had escaped its enclosure and which Laxton thought was endangering him, the Defendant took it upon himself to accost Laxton and King – a completely innocent bystander – with a loaded gun, point the weapon at them, and threaten to shoot them. This factor, as well as the preceding one, weighs heavily against the Defendant. See Dunn, 2006 WL 1627335, at *9 (affirming denial of judicial diversion where, even though factors (3), (4), and (5) weighed in the defendant's factor, the circumstances of the offense were "particularly troublesome" where defendant held a gun six inches from victim's head). As to the remaining factors, the Defendant has no criminal record; his social history indicates prior troubles with his neighbors due to previous escapes of his wolf-hybrids, as well as a willingness to file questionable legal proceedings against persons he deems to have wronged him in some way; and his physical and mental health appear to be satisfactory. These factors, however, are entitled to little weight under the facts of this case. Thus, the record supports the trial court's implied finding that judicial diversion will not serve the ends of justice in this case. Accordingly, we hold that the trial court did not abuse its discretion in denying judicial diversion.

Length of Sentences

The Defendant also complains that the trial court erred in failing to apply mitigating factors in setting his sentences.[30] See Tenn. Code Ann. § 40-35-113 (2006). Mitigating factors may be used, in the trial court's discretion, to reduce the length of a particular sentence. See id. § 40-35-210(c)(2) (2006).[31] In this case, however, the trial court imposed the minimum sentence for each of the Defendant's felony convictions. The Defendant was sentenced as a Range I standard offender, and the minimum Range I sentence for an intentional or knowing aggravated assault, a Class C felony,[32] is three years. Id. § 40-35-112(a)(3) (2006). The minimum Range I sentence for burglary of a vehicle, a Class E felony,[33] is one year. Id. § 40-35-112(a)(5). Accordingly, the Defendant in no way was prejudiced by the trial court's failure to apply mitigating factors, and this issue is therefore without merit.

**Conclusion**

In summary, the trial court erred in determining that the Defendant had waived his right to counsel two weeks prior to trial. We hold, however, that the Defendant forfeited his right to counsel at trial by engaging in egregious misconduct aimed at delaying, disrupting, and preventing the orderly administration of justice. Therefore, the Defendant is entitled to no relief on this issue. We further have determined that the Defendant is entitled to no relief on the remaining issues raised in his brief. Accordingly, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

---

[30] We again note specifically that the Defendant raised no challenge to the consecutive sentences imposed by the trial court.

[31] In misdemeanor sentencing, a trial court "shall consider the . . . mitigating factors" in determining the percentage of the misdemeanor sentence that the defendant is to serve in actual confinement. Tenn. Code Ann. § 40-35-302(d) (Supp. 2007). In this case, the Defendant was convicted of two Class A misdemeanors for theft under $500 and sentenced to eleven months, twenty-nine days on each offense. The trial court did not designate a percentage of these misdemeanor sentences to be served, however, because it ordered each of these sentences to be served concurrently with the Defendant's three year sentence on one of his aggravated assault convictions. Moreover, "[i]f no percentage is expressed in the judgment, the percentage shall be considered zero percent (0%)." Id. Any error by the trial court in its consideration of the mitigating factors with respect to the Defendant's misdemeanor sentences is therefore harmless.

[32] Tenn. Code Ann. § 39-13-102(d)(1).

[33] Tenn. Code Ann. § 39-14-402(d).