# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 17, 2013

## STATE OF TENNESSEE v. SHELENDA NICOLE WINDMON

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-61     Cheryl Blackburn, Judge**

---

**No. M2012-02540-CCA-R3-CD   Filed November 7, 2013**

---

Shelenda Nicole Windmon ("the Defendant") pleaded guilty to one count of attempt to commit aggravated child abuse. Pursuant to her plea agreement, the Defendant was sentenced as a Range II offender to six years with manner of service to be determined by the trial court. After a hearing, the trial court granted probation but denied the Defendant's request for judicial diversion. The Defendant now appeals the trial court's denial of judicial diversion. Upon our thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Eugenia R. Grayer, Nashville, Tennessee, for the appellant, Shelenda Nicole Windmon.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with two counts of aggravated child abuse, committed in October 2011. The Defendant subsequently pleaded guilty to one count of attempted aggravated child abuse, and the second count of the indictment was dismissed. At the

sentencing hearing to determine the manner of service of the sentence and to address the Defendant's request for judicial diversion, the following proof was adduced:

Officer Jason King of the Metro Nashville Police Department ("MNPD") testified that he was working patrol on the evening of October 5, 2011. He and his field training officer, Officer Mac Peebles, responded to a call that a naked child was running down the street. Officer King saw the child a few seconds after another officer had caught and restrained him. The child was "very hysterical and crying" and expressed his fear that the officers would return him to his mother. The child told the officers that he was thirteen years old. The officers placed the child ("the victim") in the back of a patrol car and obtained some clothes for him from a neighbor.

The victim told the officers that, on his way home from school with his mother, his mother began disciplining him for his reported misbehavior at school. The victim said that his mother struck him in the head with a plastic Coke bottle while they were in the car and that, once they got home, she told him to take off his clothes. She then began to strike him with an extension cord. Eventually, the victim was able to break free and ran outside.

Later that evening, Officer King was at Vanderbilt Children's Hospital with the victim when the Defendant arrived. He spoke with her and subsequently took her into custody.

Officer King identified photographs of the victim's injuries taken while he and the child were at the hospital. These photographs were admitted into evidence.

On cross-examination, Officer King stated that, at the time he initially spoke with the Defendant at the hospital, she was "very distraught."

Field training Officer Mackovis Peebles of the MNPD testified that he responded to the scene with Officer King. He was also at the hospital later that day, where he spoke with the Defendant. She told him that she had hit the victim in the head with an empty Coke bottle. She did not tell Officer Peebles that the victim hit her first. Officer Peebles explained that the Defendant was crying during the interview.

On cross-examination, Officer Peebles acknowledged that he had visited the Defendant's house since this incident on a couple of occasions, not related to any allegations of child abuse. When asked how the Defendant's children had appeared to be doing during his visits, Officer Peebles responded, "They are doing just great."

The Defendant testified that she was then thirty-three years old and worked at Tiger Market as a cashier. Prior to this job, she had been employed as a certified nurse's assistant

by Right At Home. She had been working for Right At Home since she moved to Nashville in March 2011. She lost that job because of her arrest for the instant offense. The Defendant testified that she had been a certified nurse's assistant for eleven years and that she was certified in Indiana, Tennessee, and Michigan. She stated that she would not be allowed to work as a certified nurse's assistant with a felony conviction on her record.

The Defendant testified that she grew up in Michigan with both parents, three brothers, and three sisters. Her mother disciplined the children by "whooping" them "[w]ith an extension cord or . . . whatever she got her hands on." The Defendant first got pregnant at seventeen years old, for which her mother "whooped" her. The Defendant's daughter from that pregnancy was fifteen years old at the time of the hearing.

After her eldest daughter was born, the Defendant left home and was working and going to school. She had twin boys, one of whom was the victim in this case, when she was eighteen years old. All three of these children were fathered by Craig Tisdale. She had her fourth child when she was twenty-one years old, also fathered by Tisdale. She continued working and going to school. She obtained her diploma a few months after her fourth child was born.

The Defendant testified that her relationship with Tisdale was physically abusive. Her parents assisted her in leaving Tisdale. She then moved to Nashville in March 2011.

In October 2011, the victim was attending Twilight School because of his behavior problems in regular school. The Defendant testified that the victim had thirteen infractions at his regular school, including fighting with other students, talking back to the teachers, and taking a BB gun to the bus stop. Twilight School began after the regular school day ended and ran until 7:30 in the evening. The victim continued to misbehave at Twilight School. The Defendant testified that the victim also had been misbehaving at home:

> [I]f I turned my back he was hitting his siblings, hitting on his siblings or taking something from them or something, he didn't want to listen, he didn't want to do his chores or anything. He just basically wanted to do what he wanted to do.

On October 5, 2011, one of the victim's teachers called the Defendant and told her to come get him because he had been leaving the school building. When the Defendant arrived, she spoke with the teacher about the victim's behavior. The victim then told the Defendant that the teacher was prejudiced. The Defendant and the victim continued their discussion in the car on the way home. The Defendant testified that, during the discussion and while she

was driving, the victim "smacked" her. She did not tell the police about this, but she did tell Folanda Tolston, the "worker," about the victim's hitting her.

The Defendant testified that, after the victim hit her, she hit him with the empty plastic drink bottle that she was holding at the time. She stated that none of her children had ever hit her before and that she was "shocked" by the victim's behavior.

The Department of Children's Services later held a hearing and enjoined the Defendant from using corporal punishment on her children. She also was ordered to attend parenting and anger management classes, which she completed. She learned how to discipline her children without using corporal punishment. Her children were returned to her in January 2012. She instituted a reward system for good behavior, and the children had responded well. The victim and his brother were in the school band. Her eldest daughter attended "Y" camp. The Defendant attended the children's activities.

The Defendant stated that she did not have a history of drug or alcohol abuse. Two of her sisters and one of her cousins lived nearby and could help her with the children when necessary. She stated that, if she was put on judicial diversion and was later able to expunge her record, she would return to work as a certified nurse's assistant.

On cross-examination, the Defendant admitted that the Michigan Department of Children's Services had investigated allegations against her on several occasions. The Defendant stated that the complaints were false but admitted that one of the complaints "was because [she] whooped" her youngest son. She was sent to anger management classes as a result.

The Defendant admitted to having whipped her children with belts while they lived in Michigan. She, however, stated that she did not injure her children. She also stated that it was "very seldom" that she imposed this punishment.

The Defendant denied that she was responsible for all of the marks on the victim's body that appeared in the photographs. She did not know how the other marks were caused. She theorized that some of his injuries may have resulted from play or from the police "tackling" him. She acknowledged hitting the victim "once or twice" with the extension cord and causing injuries to the victim's legs and "bottom." She acknowledged that, while she and the victim were in the car, she hit him with the empty plastic Coke bottle "a few times." She stated that, when the victim ran out of the house, he still had his clothes on and that she had not made him strip before punishing him. Rather, he "had his pants down." She found his clothes in the building breezeway.

When the trial court asked the Defendant to clarify what it was that she thought she had done wrong, the Defendant responded as follows:

> I did wrong by whooping [the victim], you know, – I didn't know you couldn't whoop your kids. I did wrong by whooping him and hitting him with the Coke bottle, yes, I admit that I'm very wrong for that. You know, it change a whole lot of me and my kid's life, but that is the only thing that I can think of.

> I have learned new ways to do different things now other than that. But as far as just plain out beating my kids all of the time, I never done that. I have always been a good mother to my kids.

On redirect examination, the Defendant explained that, at the Child Services hearing in January 2012, the victim testified and admitted to having hit the Defendant in the car. The victim also testified that the police had hit him with a billy club. The victim's brothers also testified that the police had tackled the victim.

At the end of the Defendant's testimony, the medical records prepared in conjunction with the victim's visit to the hospital were admitted into evidence. These documents reflect that the examination of the victim indicated "[h]ead trauma; scalp swelling; . . . swelling of left arm[; and] left arm tender to palpation." The condition of the victim's skin was reported as "[a]brasions; face and scalp. Bruising; scalp, bilateral flanks, upper back, upper thighs with coiled loop marks, reddish purple." X-rays of the victim's left arm were normal. A document titled "Flowsheet" indicated that the victim had nine "quarter size raised red areas" on his head; four "linear raised red marks" on his clavicle; five "'c' shaped red raised marks" to the base of his neck/upper back area; four "'c' shaped red raised areas" on his left forearm; several "raised red areas" to both of his outer thighs and "old healed scars with similar shape of existing red marks" on his right outer thigh. The medical records also include the following narrative of the victim's report:

> Per [victim], [victim] was picked up from afterschool program by his mom. [Victim] states that on the way home in the car his mom started punching him with fist and hitting him with bottle because he got in trouble at school. [Victim] says that when he got home, his mom took all his clothes off and started hitting him "alot" with extension cord. [Victim] states that "I couldn't take it anymore, so I ran." [Victim] states that he ran and ran into police who were already in his neighborhood.

At the conclusion of the hearing, the trial court placed the Defendant on intensive probation. The trial court, however, denied the Defendant's request for judicial diversion. The Defendant appeals from the trial court's denial of judicial diversion.

## Standard of Review

Judicial diversion is a form of "legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999) (quoting Tenn. Code Ann. § 40-35-313(b)). The Defendant is eligible for judicial diversion because she pleaded guilty to a Class C felony, has not previously been convicted of a felony or Class A misdemeanor, has not previously been granted diversion, and is not seeking deferral for a sexual offense. See Tenn. Code Ann. § 40-35-313(a)(1)(B)(i) (Supp. 2011).

We will reverse a trial court's denial of judicial diversion only for an abuse of discretion. See State v. Turco, 108 S.W.3d 244, 246 n.5 (Tenn. 2003) (citing State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)). Upon review of a denial of judicial diversion, we will accord the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." Anderson, 857 S.W.2d at 572 (quoting Hammersley, 650 S.W.2d at 356).

A trial court must consider several factors in determining whether to grant judicial diversion: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal history; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) special and general deterrence value; and (7) whether judicial diversion will serve the ends of justice. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). When the trial court fails to consider all of these factors, we consider these factors de novo to determine whether the trial court abused its discretion in denying judicial diversion. See State v. Jonathan B. Dunn, No. M2005-01268-CCA-R3-CD, 2006 WL 1627335, at *9 (Tenn. Crim. App. June 12, 2006).

## Analysis

In considering the Defendant's request for judicial diversion, the trial court acknowledged each of the factors it was required to consider. The court noted that the Defendant had "not been [in] any trouble since this arrest," that she did not "appear to have any current drug usage," and that she was employed but was no longer able to work as a certified nurse's assistant because of this incident. The trial court also noted the

circumstances of the offense, referring to the victim's statement included in the medical records, that the Defendant had hit him with the plastic bottle and with her fist and then hit him with an extension cord after stripping him. The trial court commented that "none of that is the appropriate way to deal with a child whatsoever to the extent that this child has to go to the emergency room. Taking a bottle and hitting your child over the head, and then hitting with a fist, and then stripping him down and using an extension cord is just outrageous."

The trial court placed great emphasis on the Defendant's attitude and her amenability to correction. The trial court found that the Defendant minimized her role in the offense and tried to blame the police for some of the victim's injuries, a claim the trial court rejected. The trial court also found that the Defendant's amenability to correction was "compromised" because her child-rearing skills previously had been investigated by the Michigan authorities, resulting in a requirement that she attend classes. The trial court also found that judicial diversion was "not in the interest of justice, and the deterrence value to others is such that she now needs to have a conviction on her record for the rest of her life."

The Defendant argues to this Court that the trial court's conclusion that the Defendant is not amenable to correction is "specious," referring to the Defendant's successful completion of parenting classes since the instant offense and proof that the Defendant no longer utilized corporal punishment. The Defendant also contends that the trial court abused its discretion because it "recognize[d], but seem[ed] to disregard the significance of the fact that in denying Judicial Diversion, . . . the [Defendant] is effectively forever barred from working in her . . . professional field of employment as a certified nursing assistant."

We hold that there is substantial evidence in the record to support the trial court's denial of judicial diversion to the Defendant. Certainly, it is commendable that the Defendant refrained from using corporal punishment against her children during the time period between her completion of her Tennessee parenting classes and her sentencing hearing. Nevertheless, this Court has recognized that a defendant's failure to accept full responsibility for his or her actions has a negative impact on his or her amenability to correction. See, e.g., State v. Michael W. Parsons, No. W2010-02073-CCA-R3CD, 2011 WL 6310456, at *34 (Tenn. Crim. App. Dec. 15, 2011), perm. app. denied (Tenn. May 23, 2012); State v. Lonna K. Brewer, No. M2005-01876-CCA-R3-CD, 2006 WL 2206059, at *6 (Tenn. Crim. App. Aug. 3, 2006). The proof at the sentencing hearing demonstrated that, while the Defendant acknowledged that she was wrong in hitting the victim with the bottle and with the extension cord, she also denied causing all of the injuries documented in the medical records. There is no proof in the record, other than the Defendant's own testimony, that the victim's injuries were caused by anyone other than the Defendant. We defer to the trial court's determination about the Defendant's credibility. Accordingly, we hold that the record supports the trial court's determination that the Defendant's amenability to correction

was "compromised" and weighed against the grant of judicial diversion. The record also supports the trial court's finding that the circumstances of the offense were "outrageous" and weighed against the grant of judicial diversion.

Finally, a defendant's potential loss of employment opportunities in the face of a felony conviction does not imply, in and of itself, that a trial court abused its discretion in denying judicial diversion. See, e.g., State v. Twiss, 570 N.W.2d 487, 487 (Minn. 1997) ("The possibility that a defendant may lose her job in a corporation's security department as a result of a conviction of gross misdemeanor malicious punishment of a child is not a 'special circumstance' allowing the trial court to stay an adjudication of guilt over the prosecutor's objection.") (citing State v. Foss, 556 N.W.2d 540 (Minn. 1996)). It is an unfortunate fact that a felony conviction frequently results in the loss of job opportunities. Yet, the mere fact that a conviction may cause a loss of future job opportunities does not dictate a grant of judicial diversion. When substantial evidence in the record supports the denial of judicial diversion, this Court will affirm the trial court's decision.

We hold that the record in this case supports the trial court's denial of the Defendant's request for judicial diversion. Therefore, the trial court did not abuse its discretion on this issue. Accordingly, the Defendant is entitled to no relief on this basis.

**Conclusion**

Based on the foregoing, we affirm the trial court's judgment.

_____
JEFFREY S. BIVINS, JUDGE